## Eric Keith HOYLE *v.* STATE of Arkansas

CR 06-1249                                                    268 S.W.3d 313

Supreme Court of Arkansas
Opinion delivered November 15, 2007

[Rehearing denied January 10, 2008.]

The Law Offices of J. Brent Standridge, P.A., by: J. Brent Standridge, for appellant.

Dustin McDaniel, Att'y Gen., by: Laura Shue, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Eric Keith Hoyle appeals the order of the Polk County Circuit Court convicting him of one count of battery in the first degree and two counts of manslaughter. On appeal, he argues that the trial court erred in: (1) denying his motion for a directed verdict on all counts; (2) denying his motion to suppress evidence of chemical test results; (3) allowing certain expert testimony. This case was certified to us from the Arkansas Court of Appeals as involving an issue of first impression, a question pertaining to the interpretation of the federal constitution, and a substantial question of law concerning the interpretation of an act of the Arkansas General Assembly; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1), (3), and (6). We find no error and affirm.

## Facts

On July 29, 2004, while driving a tractor trailer with a loaded chip hauler attached, Hoyle crossed the center line and struck an on-coming motor home driven by Hilda Dean. Hilda and her grandson Gary Dean, a passenger, were killed in the collision, while a third passenger, Dillon Holbrook, also Dean's grandson, was seriously injured. During the course of investigating the accident, officers believed that Hoyle might have been driving under the influence of drugs or alcohol at the time of the accident. Hoyle, who was transported by ambulance to a local hospital, was presented with a consent form to allow authorities to obtain a blood and urine sample from him. The samples later revealed the presence of amphetamine and methamphetamine in his system.

Hoyle was charged by felony information with one count of battery in the first degree and two counts of manslaughter. Prior to trial, he filed a motion in limine seeking to exclude any mention that he had controlled substances in his system at the time of the accident. A pretrial hearing was held on November 29, 2005, to consider Hoyle's motion to suppress evidence of his blood and urine test on the basis that such evidence was the fruit of an unlawful search and seizure and also violated his rights under the Health Insurance Portability and Accountability Act (HIPAA), codified at 42 U.S.C. §§ 1320d et seq. Additionally, Hoyle filed a motion to declare Ark. Code Ann. § 5-65-202 (1987) unconsti-

tutional.[1] Hoyle raised several arguments in support of his suppression motion, including that the taking of his blood and urine was an unlawful search and seizure because it was not consensual. The State argued that it was consensual, as evidenced by Hoyle's signing of the "Blood Alcohol/Controlled Substances Rights Form." Alternatively, the State argued that an officer who suspects alcohol or drug use in an accident where there is a fatality is required to seek consent for a blood or urine test, pursuant to state statute.

In response to Hoyle's motion, Deputy Price testified that he had previously arrested Hoyle for possession of a Schedule II controlled substance, methamphetamine. On the day of the accident, he had reason to believe that Hoyle was under the influence of a controlled substance based on this previous arrest, as well as information developed at the scene, particularly a lack of any other contributing factor that would have caused Hoyle to leave the roadway and hit another vehicle.

Additionally, Corporal Wendell Adams, with the Arkansas State Police, testified that he investigated the accident scene on July 29, and as his investigation progressed, he became concerned that Hoyle might have been under the influence of drugs or alcohol. Hoyle's demeanor and overall appearance concerned Adams. Also, Adams interviewed the driver of a truck who had been behind Hoyle and who stated that he never saw Hoyle apply his brakes prior to the collision and that he had almost run a tanker off the road prior to this accident. Thus, according to Adams, he believed he had enough probable cause to request a chemical test. The trial court denied Hoyle's motion, ruling that the State had proven that Hoyle consented to the blood draw and, alternatively, that there was probable cause to request the test.

Finally, Hoyle argued that the samples were obtained in violation of his rights under HIPAA. Specifically, he argued that the presence of law enforcement officers at the hospital while he was being treated violated HIPAA, which supersedes any state statute, and that he did not consent to any disclosure of his medical information. The State countered that HIPAA does not apply in cases where consent has been given, such as the present case.

---

[1] As required by law, notice was given to the Attorney General that Hoyle was challenging the constitutionality of a state statute. The Attorney General agreed that the prosecutor would be able to handle any arguments regarding such a challenge.

Additionally, the State argued that there was no evidence that any officer overheard or was provided with medical information relating to Hoyle. The trial court agreed with the State, ruling that there was no evidence of a HIPAA violation, where Hoyle consented to the taking of the samples and no officers were given any of Hoyle's medical information.

On February 9, 2006, a pretrial hearing was held to conduct a *Daubert* analysis of expert testimony regarding the effects of methamphetamine on an individual's physical and mental faculties that the State sought to introduce at trial. The State produced the testimony of Dr. Alex Pappas, a board certified pathologist, regarding the effects of Hoyle having methamphetamine in his system at the time of this accident. Dr. Pappas testified that he has had experience dealing with individuals who have methamphetamine in their system and that they are usually agitated, show irrational behavior, may be psychotic, fatigued, have a rapid pulse, and show signs of paranoia. In regards to a person on methamphetamine operating a motor vehicle, Dr. Pappas testified that the person might drift in and out of a lane, exhibit risky behavior, or drive off the road. The court inquired of Dr. Pappas if he believed that his opinions regarding the behavioral effect of methamphetamine, particularly driving behavior, are widely accepted in the scientific community, to which Dr. Pappas replied, "Yes." The trial court then ruled that Dr. Pappas was qualified to testify as an expert witness and that his opinion testimony was based on reliable scientific evidence that was not particularly novel.

Hoyle was tried by a jury on March 9, 2006. At trial, Corporal Adams testified about his investigation of the accident. According to Adams, he was called to work a crash site on Highway 71 south of Mena. When he first arrived, Adams saw an unidentified metal frame and a chip trailer with tractor trailer attached to it. The tractor trailer was on fire, and the chip trailer was partially on fire. Adams soon discovered that the metal frame was the remnants of a 1990 Chevrolet Motor Home, estimated to have been thirty feet long. The driver of the motor home and her two passengers had been taken from the scene to area hospitals prior to Adams's arrival. Adams then noticed a man, later identified as Hoyle, sitting up on a hill in front of a feed store. According to Adams, in reconstructing the accident, he was able to determine that the Hoyle vehicle, which originated in Mansfield, Arkansas, and weighed over 82,000 pounds, was originally traveling southbound, while the Dean vehicle was headed northbound, when

Hoyle's vehicle crossed the center line and hit the Dean vehicle at a forty to forty-five degree angle. The impact of Hoyle's vehicle pushed the Dean vehicle backwards before Hoyle's vehicle went through the motor home. Adams stated that as part of his investigation he requested Hoyle to submit to a blood and urine test.

Deputy Price testified that he first came into contact with Hoyle at the scene of the accident and then followed him to the Mena Medical Center. There, Price presented Hoyle with a "Blood Alcohol/Controlled Substances Rights Form" and explained the document to him prior to having hospital staff administer urine and blood samples.

Elizabeth Lowman-Smith, testifying as an expert, stated that her testing of Hoyle's urine sample revealed the presence of both amphetamine and methamphetamine in his system. A subsequent blood screen revealed an amount of methamphetamine quantified at .221 micrograms per milliliter.

James Gann, a truck owner who was driving a commercial truck that was behind Hoyle's vehicle immediately prior to the accident, also testified. According to Gann, he heard an encounter over his CB radio where the driver of a tanker "chewed on somebody" whom Gann believed to be Hoyle. Evidently, the driver of a chip hauler almost hit the tanker driver after crossing the center line. The driver of the chip hauler apologized and then later Gann heard this same person become quite talkative as they approached Mena. Shortly thereafter, just outside of Wickes, Gann witnessed the chip hauler cross the center line and crash into an oncoming vehicle, causing that vehicle to explode. According to Gann, the brake lights on Hoyle's vehicle had previously been activated but never came on before Hoyle crashed into the motor home. According to Gann, he never saw anything that would have caused Hoyle to swerve into the on-coming traffic lane.

Dr. Pappas testified that he is familiar with the effects of methamphetamine on the human body. Specifically, Dr. Pappas testified that such effects include euphoria, self-grandisment, reckless behavior, and the inability to sleep. In addition, Dr. Pappas testified about studies that have been done on the effect of methamphetamine and driving, and such studies link methamphetamine with reckless driving behavior, particularly crossing the center line and hitting another vehicle. According to Dr. Pappas, not only does methamphetamine cause a deterioration in driving abilities, it causes problems because it makes a person stay up for so

long that they can nod off when driving. While Dr. Pappas admitted that there are some legitimate issues for prescribing methamphetamine, including ADD and narcolepsy, such doses would be at a therapeutic level of .02 or .03 micrograms per milliliter. Dr. Pappas also stated that based on the testimony that he had heard in court, at the time of the accident, Hoyle "was either coming up, going up or he was certainly under the effect" of methamphetamine. He further elaborated that the .221 micrograms per milliliter without a doubt had a negative effect on the driving in this case.

Following the presentation of the State's evidence, Hoyle moved for a directed verdict on both counts of manslaughter, as well as the count of battery in the first degree. Hoyle renewed these motions at the close of all the evidence. The jury was instructed and subsequently returned guilty verdicts as previously set forth. A judgment and commitment order was entered on March 24, 2006, and a timely notice of appeal was filed.

## I. Sufficiency of the Evidence

As his first point on appeal, Hoyle argues that there was insufficient evidence to support his convictions for battery and manslaughter. Specifically, with regard to the battery conviction, Hoyle avers that there was no evidence that he acted "under circumstances manifesting extreme indifference to the value of human life." With regard to the manslaughter convictions, Hoyle argues that the evidence failed to establish that he acted recklessly. With respect to both the battery and manslaughter convictions, Hoyle argues that they should be reversed or, alternatively, reduced to lesser-included offenses. The State counters that there was sufficient evidence to support each of Hoyle's convictions.

We treat a motion for directed verdict on appeal as a challenge to the sufficiency of the evidence. See Young v. State, 370 Ark. 147, 257 S.W.3d 870 (2007). We will affirm the circuit court's denial of a motion for directed verdict if there is substantial evidence, either direct or circumstantial, to support the jury's verdict. See id. This court has repeatedly defined substantial evidence as "evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture." Id. at 151, 257 S.W.3d at 875. Furthermore, "[t]his court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered." Id.

### a. Battery in the First Degree

We turn first to the battery conviction. Hoyle was charged with violating Ark. Code Ann. § 5-13-201(a)(3) (Supp. 2005), which provides that a person commits battery in the first degree if: "He or she causes serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life." According to Hoyle, the phrase "under circumstances manifesting extreme indifference to the value of human life" means deliberate conduct with a knowledge or awareness that one's actions are practically certain to bring about the prohibited result.

In *Tarentino v. State*, 302 Ark. 55, 786 S.W.2d 584 (1990), this court explained that the primary way in which first-degree battery differs from second- and third-degree battery is the state of mind of the actor. The court went on to explain that in order to be convicted of first-degree battery, a defendant must act with the purpose of causing serious physical injury to another person. Moreover, the circumstances of the first-degree battery must by necessity be more dire and formidable in terms of affecting human life. *See Tigue v. State*, 319 Ark. 147, 889 S.W.2d 760 (1994). The attendant circumstances must be such as to demonstrate the culpable mental state of the accused. *Id.* The *Tigue* court further elaborated that first-degree battery involves actions which create at least some risk of death and which, therefore, evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim. *Id.*

Here, the evidence showed that Hoyle acted recklessly under circumstances manifesting extreme indifference to human life. Specifically, the evidence demonstrated that Hoyle drove a fully loaded commercial vehicle weighing over 82,000 pounds while under the influence of methamphetamine. Ms. Lowman-Smith testified that she tested Hoyle's urine for drugs and discovered the presence of amphetamine and methamphetamine. A subsequent test on Hoyle's blood confirmed the presence of methamphetamine. Dr. Pappas testified that an individual's physical abilities are affected by the presence of methamphetamine in his system, including his driving abilities. According to Dr. Pappas, methamphetamine can cause a driver to weave across lanes of traffic, take undue risks, or leave the roadway. In this case, Hoyle's entire vehicle, with the exception of the right rear axel, crossed into the oncoming-traffic lane, striking the motor home, and

ultimately driving through it. Hoyle never attempted to brake prior to the accident or to return to the proper lane of traffic. It is apparent based on the evidence in this case that Hoyle exhibited reckless conduct that involved a conscious disregard of a perceived risk. Accordingly, we cannot say that the trial court erred in denying Hoyle's motion for directed verdict on the first-degree battery charge.

### b. Manslaughter

Next, we consider Hoyle's argument that there was insufficient evidence to support his manslaughter convictions on the basis that there was no evidence that he acted recklessly. Hoyle was charged with manslaughter pursuant to Ark. Code Ann. § 5-10-104(a)(3) (Repl. 1997), which provides that a person commits manslaughter if he recklessly causes the death of another person. Arkansas Code Annotated § 5-2-202(3) (Repl. 1997) provides:

> A person acts recklessly with respect to attendant circumstances or a result of his conduct when he consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of a nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

Thus, the relevant inquiry is whether the evidence in the instant case demonstrated that Hoyle consciously disregarded a substantial and unjustifiable risk in driving while under the influence of methamphetamine. We think it does.

At trial, James Gann testified that he believed Hoyle almost ran another vehicle off the road, that Hoyle was extremely talkative at one point and then totally silent immediately prior to the accident, that Hoyle never braked immediately before striking the Dean motor home, and that Hoyle did not attempt to assist any of the victims at the scene of the accident. Trooper Adams testified that his investigation revealed that Hoyle's truck was originally traveling southbound, while the Dean vehicle was headed northbound, when Hoyle's vehicle crossed the center line and hit the Dean vehicle at a forty to forty-five degree angle. According to Corporal Adams, the impact of Hoyle's vehicle pushed the Dean vehicle backwards before Hoyle's vehicle went through the motor home. Adams also stated that while investigating the crash, he noticed Hoyle sitting by himself on a hill near the accident scene.

This evidence coupled with the toxicology report that established that Hoyle had methamphetamine in his system at the time of the accident and Dr. Pappas's expert opinion that .221 micrograms per milliliter of methamphetamine without a doubt had a negative effect on the driving in this case clearly demonstrates that Hoyle acted recklessly in driving while under the influence of methamphetamine.

We simply do not agree that the jury had to resort to speculation or conjecture in order to conclude that the methamphetamine in his system so altered his motor skills that it was the cause of the wreck. The foregoing evidence constituted substantial evidence that Hoyle recklessly caused the deaths of Hilda Dean and Gary Dean, in that he consciously disregarded a substantial and unjustifiable risk that death might occur if he operated a commercial vehicle after ingesting methamphetamine, and the disregard thereof constituted a gross deviation from the standard of care that a reasonable person would observe in Hoyle's situation.

## II. Motion to Suppress

Hoyle next argues that the trial court erred in failing to suppress evidence of blood-alcohol test results, as the obtaining of samples of his blood and urine constituted (a) an unlawful search and seizure; and (b) a violation of his rights under HIPAA. The State argues that suppression was not warranted because there was no illegal search and seizure where there was implied consent, probable cause, and a reasonable search. We first turn to his argument that the taking of the samples was an unlawful search and seizure.

### a. Unlawful Search and Seizure

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." It is well settled that the taking of blood by a law enforcement officer amounts to a Fourth Amendment search and seizure. *Polston v. State*, 360 Ark. 317, 201 S.W.3d 406 (2005); *Haynes v. State*, 354 Ark. 514, 127 S.W.3d 456 (2003); *Russey v. State*, 336 Ark. 401, 985 S.W.2d 316 (1999). *See also Schmerber v. California*, 384 U.S. 757 (1966).

Pursuant to Ark. R. Crim. P. 12.3(a), a search of an accused's blood stream may be made only:

(i) if there is a strong probability that it will disclose things subject to seizure and related to the offense for which the individual was arrested; and

(ii) if it reasonably appears that the delay consequent upon procurement of a search warrant would probably result in the disappearance of destruction of the objects of the search; and

(iii) if it reasonably appears that the search is otherwise reasonable under the circumstances of the case, including the seriousness of the offense and the nature of the invasion of the individual's person.

Here, the trial court ruled that there was probable cause warranting the taking of Hoyle's blood and urine samples. Deputy Price testified that he had reason to believe that Hoyle was intoxicated at the time of the accident. According to Price, there was no other legitimate explanation of what would have caused Hoyle to leave his lane of traffic and crash into the motor home. Price also stated that he was familiar with Hoyle, having previously arrested him for possession of methamphetamine. Corporal Adams also testified that he believed Hoyle to be under the influence at the time of the accident based on his reconstruction of the accident. Adams stated that Hoyle's vehicle caused a head-on collision in the wrong lane, there were no skid marks, and based on a witness's statement, Hoyle never applied the brakes before hitting the motor home. Adams also pointed to the fact that there were no other conditions present that seemed to be contributing factors and that Hoyle's demeanor and appearance caused him to suspect Hoyle was under the influence. This evidence complies with the first requirement of Rule 12.3. In addition, if officers had waited to obtain samples from Hoyle, it is quite possible that his blood would have metabolized the methamphetamine, resulting in the destruction of this evidence. Finally, the intrusion caused by the taking of the blood and urine samples was minor and the seriousness of the offense was obvious, considering that the accident involved two fatalities and a third serious injury. Accordingly, because there was probable cause supporting the taking of Hoyle's blood and urine samples, it is unnecessary for us to consider Hoyle's argument regarding his lack of consent or his challenge to the constitutionality of section 5-65-202.

### b. HIPAA Violation

In addition to his illegal search and seizure argument, Hoyle contends that suppression was warranted in this case because the taking of the samples violated his rights under HIPAA. According to Hoyle, the State used medical personnel to obtain medical evidence from him without complying with HIPAA. The State counters that Hoyle has the burden of establishing how HIPAA applies and why suppression is warranted in this instance and fails in both regards.

██ In advancing his HIPAA argument, Hoyle simply states that "by utilizing hospital personnel the government obtained medical evidence from Appellant without utilizing any of the accepted measures under HIPAA." Hoyle then seems to argue that pursuant to HIPAA, officers were required to seek a subpoena, warrant, or court order prior to taking any samples from him. At a pretrial hearing below, however, Hoyle argued that the taking of his samples was a HIPAA violation because officers were present while he was being treated for injuries related to the accident. Because Hoyle has changed his argument on appeal, it is unnecessary to address his argument on this point. *See Hunter v. State*, 330 Ark. 198, 952 S.W.2d 145 (1997) (holding that an appellant cannot change his argument on appeal and that he is limited to the scope and nature of the argument made below).

### III. Admission of Expert Testimony

As his final point on appeal, Hoyle argues that the trial court abused its discretion in allowing the expert testimony of Elizabeth Lowman-Smith, a toxicologist, and Dr. Alex Pappas, a pathologist, over his objections. According to Hoyle, their testimony was not helpful to the jury and was not sufficiently reliable and, thus, inadmissible as expert testimony. Hoyle also appears to argue that the admission of Dr. Pappas's testimony about the effects of methamphetamine was unduly prejudicial. The State counters that the trial court did not abuse its discretion in admitting the expert testimony of Lowman-Smith and Dr. Pappas and that any argument regarding prejudicial effect is not preserved for review.

At the outset, we note our agreement with the State that Hoyle never challenged the admissibility of Dr. Pappas's testimony on the basis that it was unduly prejudicial; thus, any such argument is precluded on appeal. *See, e.g., White v. State*, 370 Ark. 284, 259

S.W.3d 410 (2007) (holding that an argument may not be raised for the first time on appeal). Now, we turn to the issue of whether the expert testimony presented in this case comports with the rules of evidence.

Arkansas Rule of Evidence 702, which governs expert testimony, states that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *Farm Bureau Mutual Insurance Co. of Arkansas v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), this court adopted the United States Supreme Court's interpretation of Federal Rule of Evidence 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under *Foote* and *Daubert*, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts in the case. This court has also adopted the subsequent Supreme Court decision in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), holding that Rule 702 applies equally to all types of expert testimony and not simply to scientific expert testimony and that they must be shown to be both reliable and relevant. *See Coca-Cola Bottling Co. v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003).

Here, Lowman–Smith testified at trial that she found .221 micrograms per milliliter of methamphetamine in the blood sample Hoyle submitted. Lowman-Smith explained that she tested the 4.5 milliliter sample of blood using a mass spectrometer and a gas chromatograph, which are generally accepted and recognized procedures for testing blood to determine a quantifiable amount. On appeal, Hoyle argues that Lowman-Smith's testimony was unreliable because she used an extrapolation to arrive at the quantifiable amount. This argument is wholly without merit as Lowman-Smith never testified at trial regarding the extrapolation amount; rather, she only testified to the quantifiable amount determined to be in the 4.5 milliliter sample.

As to Dr. Pappas's testimony, Hoyle argues that Dr. Pappas had never been qualified to give testimony regarding the effect of methamphetamine in Arkansas state courts and his testimony regarding methamphetamine had not previously been accepted before. Simply because this specific testimony had never

been accepted before does not render it unreliable or not helpful to the jury. Here, the trial court inquired of Dr. Pappas if the information regarding the effects of methamphetamine was widely accepted in the scientific community, to which Dr. Pappas stated that it was. Moreover, Dr. Pappas was qualified by training and experience to testify regarding his opinion on the effects of methamphetamine. Finally, the opinion testimony of Dr. Pappas was helpful to the jury in that his testimony provided insight into the mental and physical effects of methamphetamine on an individual. This case is simply not analogous to the situation in *Middleton v. State*, 29 Ark. App. 83, 780 S.W.2d 581 (1989), a case relied on by Hoyle. In *Middleton*, the court of appeals held that an officer's testimony fixing appellant's alcohol level at a specific level based on physical test was inadmissible and manifestly prejudicial because the proper foundation had not been laid to establish the reliability, accuracy, and validity of the test. The same does not hold true here, where the trial court conducted a *Daubert* hearing and Dr. Pappas testified to his training and experience and also testified to the fact that his opinion testimony was widely accepted by the scientific community. Accordingly, we cannot say that the trial court erred in admitting the expert testimony of Dr. Pappas.

Affirmed.