2009 Ark. 300

**Montrell Dashone VENTRY, Appellant,**

v.

**STATE of Arkansas, Appellee.**

No. CR 08–1232.

Supreme Court of Arkansas.

May 21, 2009.

Phyllis J. Lemons and Gregory K. Crain, Malvern, for appellant.

Dustin McDaniel, Att'y Gen., by: Karen Virginia Wallace, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice.

This appeal arises from the convictions of Appellant Montrell Dashone Ventry for capital murder and aggravated robbery stemming from an incident that occurred on August 5, 2007. On appeal, Appellant asserts that the trial court erred in (1) denying his directed-verdict motion; (2) denying his motion to suppress; (3) denying his motion to transfer to juvenile court, and in the alternative, grant extended juvenile jurisdiction; (4) admitting a police officer's comment as part of his recorded statement to police; (5) admitting a statement by Sultannah Saddiq; (6) allowing a transcript of his taped statement to be passed to the jurors to read while the tape was played; and (7) overruling his objection to the appeal to the jurors' sympathy in the prosecutor's closing argument. Because Appellant was sentenced to life imprisonment without parole, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2008). We find no error and affirm.

The testimony at trial reveals the following. Eddie Dixon of North Little Rock testified that on August 5, 2007, his cousin, Nicholas Jones, drove him to meet a woman named Sultannah Saddiq in Benton. Dixon stated that he was on his cell phone with Sultannah as they were driving, and she was giving him directions on where to meet her. Her directions led them down a path by a warehouse, where three males with guns jumped out of the bushes and told Eddie and Nicholas to get out of the car, empty their pockets, and lie on the ground. Eddie testified that he heard Nicholas arguing with two of the men. Eddie was told to take off his clothes and crawl to the back of the building. He crawled into some bushes in the back of the building. When he was in the bushes, he heard two gunshots and then heard the men drive away. Eddie looked for Nicholas, but could not find him. He left the area and ran toward the nearest lighted building, the Saline County Jail.

Don Robertson, a patrolman with the Benton Police Department, testified that he responded to the call about a possible shooting at 706 Palm Street on August 5, 2007. Upon his arrival, he saw Nicholas leaning up against the front side of the house bleeding profusely. The homeowner advised Robertson that she did not know who Nicholas was. Robertson secured the scene and called an ambulance. At this time, Robertson received a call from the jail that they were looking for a suspect or victim possibly involved in a robbery on Palm Street. Nicholas later died in the hospital from pneumonia caused by bleeding from a gunshot wound to the head.

Phillip Peckham of the White Hall Police Department was patrolling in White Hall when he was dispatched to look for a teal green Nissan Altima without a license plate. He was told by the dispatcher that the vehicle should be occupied by two black males who were supposedly intoxicated and had almost run over some people at a truck stop. Peckham drove to

Highway 270 and saw a green Nissan Altima traveling toward him. When the vehicle turned onto Hospitality Lane, he noticed that it did not have a license plate. The vehicle pulled up to the Super 8 Motel parking lot, and Peckham pulled up behind it to conduct a traffic stop. Appellant exited the driver's seat and Peckham told him that he needed to ask him about his tags. Appellant began to flee on foot. Peckham chased Appellant, caught him, and arrested him. Peckham asked Appellant why he was running and Appellant began to rap and sing about being a soldier and that he was going to burn in hell for blowing a head off. Peckham ran an NCIC check on the two men and was advised that they were both wanted for aggravated robbery and were considered armed and dangerous. He ran the VIN number on the vehicle, and it came back as being stolen out of Benton.

Peckham searched the green Altima and found marijuana, beer, and a nine millimeter semi-automatic Budapest handgun, serial number B3949. The gun was loaded with six rounds, five in the magazine and one in the chamber. He also found a box of Remington .380 ammunition.

Detective Chris Shaw testified that he interviewed Appellant in the Benton Police Department in the presence of Juvenile Officer Jay Gwatney and Appellant's mother. Shaw made both video and audio recordings of the interview, which were also transcribed. In the interview, Appellant confessed to participating in the robbery of the victims and shooting Nicholas.

Dr. Daniel Konzelmann, associate medical examiner at the Arkansas State Crime Laboratory, testified that he performed an autopsy on Nicholas on August 22, 2007. He stated that the most obvious injury was a gunshot wound between Nicholas's eye and nose. There were also some minor skin injuries. Dr. Konzelmann recovered the bullet from Nicholas's right neck. Konzelmann testified that while examining Nicholas's internal organs he was able to determine that the cause of death was pneumonia complicating a gunshot wound to the head. He stated that Nicholas was diagnosed with Adult Respiratory Distress Syndrome (ARDS) at the hospital, which he believed developed into pneumonia which caused Nicholas's death. James Looney of the Arkansas State Crime Laboratory testified that the bullet sent to him from the medical examiner's office was fired from the gun found in the car Appellant was driving.

## I. Directed-verdict motion

On appeal, Appellant asserts that the circuit court erred in denying his motion for directed verdict because there was no evidence presented by the State that Appellant was the person who committed capital murder or aggravated robbery other than his confession, which does not warrant a conviction unless made in open court or accompanied by other proof that the offense was committed.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. See *Johnson v. State,* 375 Ark. 462, 291 S.W.3d 581 (2009). We will affirm the circuit court's denial of a motion for directed verdict if there is substantial evidence, either direct or circumstantial, to support the jury's verdict. See *id.* This court has repeatedly defined substantial evidence as "evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture." *Id.* (quoting *Hoyle v. State,* 371 Ark. 495, 501, 268 S.W.3d 313, 318 (2007)). Furthermore, this court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. See *id.*

580

"A confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the offense was committed." *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001) (citing *Tinsley v. State*, 338 Ark. 342, 993 S.W.2d 898 (1999)). This requirement for other proof, sometimes referred to as the *corpus delicti* rule, mandates only proof that the offenses occurred and nothing more. *Id.* In other words, under the *corpus delicti* rule, the State must prove (1) the existence of an injury or harm constituting a crime and (2) that the injury or harm was caused by someone's criminal activity. *Id.* It is not necessary to establish any further connection between the crime and the particular defendant. *Id.* Accordingly, we must determine whether, setting aside Appellant's extrajudicial confession, the evidence demonstrates that the crime of capital murder was committed by someone.

There is clearly evidence other than Appellant's confession to demonstrate that the crime of capital murder was committed. Eddie testified that he and Nicholas were robbed at gunpoint and that while he was in the bushes behind the warehouse, he heard two shots. Nicholas was later found at a house bleeding profusely from a gunshot wound to the head. He later died in the hospital from pneumonia caused by bleeding from his head wound. Based on the evidence presented at trial, Nicholas died as a result of the homicide. The evidence was clearly sufficient to sustain Appellant's guilty verdict.

II. *Suppression of Appellant's statement*

For his next point on appeal, Appellant asserts that the trial court erred in not suppressing the Appellant's videotaped statement to Officer Chris Shaw. It appears that Appellant is disputing the voluntariness of his confession.

On appeal of a circuit court's determination of voluntariness of a confession, we make an independent determination based upon the totality of the circumstances. *Clark v. State*, 374 Ark. 292, 287 S.W.3d 567 (2008). The ruling is reversed if it is clearly against the preponderance of the evidence, which we have interpreted as being the same standard as the clearly erroneous standard. *Id.* Any conflict in the testimony of different witnesses is for the circuit court to resolve. *Id.* In essence, this court reviews the circuit court's findings of fact for clear error, and we make an independent, or de novo, determination of voluntariness. *Id.*

This court has consistently held that relevant factors in determining whether a confession was involuntary are age, education, and the intelligence of the accused, as well as the lack of advice as to his constitutional rights, the length of detention, the repeated and prolonged nature of questioning, and the use of mental or physical punishment. *Harper v. State*, 359 Ark. 142, 194 S.W.3d 730 (2004).

Officer Shaw testified that, because he had been informed that Appellant appeared to be under the influence of either narcotics or alcohol, he did not take Appellant back to Benton for an interview until the next day. Shaw stated that Appellant was aware of his *Miranda* rights prior to being transported from White Hall to Benton. According to Shaw, there was no interrogation of Appellant until 1:47 p.m. the next day at the Benton Police Department. During the interrogation, Officer Gwatney and Appellant's mother were present in the room. Before the interrogation began, Shaw read Appellant his rights and Appellant responded coherently to his questions. Shaw testified that no one promised Appellant anything, harmed him, or tried to coerce him in any way to give a statement. Shaw stated that, to the

best of his knowledge, the statement was given freely and voluntarily. Shaw took both a video and audio recording of the conversation with Appellant. These recordings support Shaw's testimony.

Furthermore, Appellant was two weeks from the age of eighteen at the time of the offense. He was the father of an infant and worked two jobs. At the March 5, 2008 hearing, the trial court found that he did not have a mental disease or defect, that he had the capacity to appreciate the criminality of his conduct, that he had the capacity to conform his conduct to the requirements of the law, and that he had the capacity for acting in a |₈purposeful manner. Based on the totality of the circumstances, we hold that the circuit court did not err in denying Appellant's motion to suppress.

■ Appellant also asserts that the trial court erred in not suppressing the portion of his statement that followed his conversation with his mother. Appellant did not raise this argument in his motion to suppress; therefore, it is not preserved for our review. *See Tryon v. State,* 371 Ark. 25, 263 S.W.3d 475 (2007).

### III. *Transfer to juvenile court*

■ For his third point on appeal, Appellant asserts that the trial court erred in denying his motion to transfer his case to juvenile court, or in the alternative, proceed under extended juvenile jurisdiction. For criminal prosecutions commenced after May 1, 1995, an order granting or denying transfer of a case from one court to another having jurisdiction over juvenile matters must be challenged by way of interlocutory appeal. *Davis v. State,* 350 Ark. 22, 86 S.W.3d 872 (2002). An appeal of such order after conviction in circuit court is untimely and will not be considered. *Id.* Here, the appeal is untimely

and the trial court's denial of the motion to transfer is affirmed.

### IV. *Police officer's comment*

■ For his next point on appeal, Appellant asserts that the trial court erred by not redacting Officer Shaw's comment to Appellant contained on the recording of Appellant's statement to police. Specifically, he asked the court to redact the officer's statement, "I know what happened." Appellant asserts that this was error because (1) the officer could |₉not testify at the trial; (2) the officer's knowledge was based on hearsay from the other two co-defendants; and (3) the statement would violate Appellant's rights to confront witnesses against him. Appellant contends that he was prejudiced because the officer's statements could have been given greater weight than Appellant's statements.

■ A statement is not hearsay unless it is offered to prove the truth of the matter asserted. *See* Ark. R. Evid. 801(c) (2008). Here, the officer's statement, "I know what happened," was not offered to prove the truth of the matter asserted, but was rather part of the officer's interrogation technique. Because the statement was not hearsay, we hold that the circuit court did not err in admitting it into evidence. Even if there were merit to his argument, he has not shown that he was prejudiced by the police officer's statement. Prejudice is not presumed, and this court will not reverse a conviction absent a showing of prejudice by the defendant. *Eastin v. State,* 370 Ark. 10, 257 S.W.3d 58 (2007).

### V. *Admission of Sultannah Saddiq's statement*

■ For his fifth point on appeal, Appellant asserts that it was error for the State to elicit testimony from Briana

Higgs about a statement Sultannah Saddiq made to her over the telephone after the crime was committed. Appellant contends that the statement was hearsay, that Briana was not one of the co-conspirators, and that it violated Appellant's right to confront the witnesses against him.

Briana testified that on the night of the shooting, she was inside her house when she heard her grandmother telling her to get some towels because someone was bleeding on the porch. Briana stated that she knew Sultannah, and the police asked Briana to call her. When Briana called, Sultannah did not answer her phone. Eventually, she did answer the phone and told Briana that she did not know the boy who had been shot. At this point during the testimony, Appellant's counsel objected on hearsay grounds. Appellant argued that the statement was not made by a co-conspirator, and therefore did not meet the hearsay exception. After an in-chambers conference, the trial court ruled that the statement was admissible under Rule 801(d)(2)(v) because Sultannah was a co-conspirator. The testimony continued, with Briana stating that when Sultannah called back, she asked what happened and Briana told her that someone had been shot. Sultannah then asked if the victim died.

Our evidence rules indicate that a statement is not hearsay if it is offered against a party and is a statement by a co-conspirator of a party made during the course and in furtherance of the conspiracy. Ark. R. Evid. 801(d)(2)(v) (2007). Here, the statement was made by Sultannah to Briana. Because Sultannah was a co-conspirator, her statements to Briana are not hearsay pursuant to Rule 801(d)(2)(v). Thus, the admission of Sultannah's statement to Briana was not error.

## VI. *Transcript of Appellant's taped confession*

For his sixth point on appeal, Appellant asserts that the trial court erred by allowing a transcript of his taped confession to be given to jurors to read while the tape was being played. At trial, Appellant objected to giving the jury the transcript to read. The objection was overruled and the transcript was given to the jury, but not proffered into evidence. While the transcript is not included in the record, Appellant concedes that there were no material misrepresentations in the transcript that would prejudice him.

Appellant offers no convincing argument or authority for his assertion that it was error to allow the jurors to read the transcript while listening to the recording of his statement. In fact, he cites to our case law in which we have upheld the use of a transcript alongside a recording that may be difficult to understand. *See Leavy v. State*, 314 Ark. 231, 862 S.W.2d 832 (1993). He admits that, "if the audio tape had been played without the transcript, it would have been necessary to play the recording several times in order to ensure the jurors' understanding of the statement." We have held, even in capital cases, that where the party fails to cite to authority or fails to provide convincing argument, we will not consider the merits of the argument. *Springs v. State*, 368 Ark. 256, 244 S.W.3d 683 (2006).

## VII. *Closing argument*

For his final point on appeal, Appellant contends that the trial court erred in overruling his objection to the prosecutor appealing to the jurors' sympathy in closing argument. In closing argument, the prosecutor stated, "[l]adies and gentlemen, I urge you, as Mr. Walton did, not to think about Montrell Ventry because that's going to be the lasting image in your mind.

Don't let that be." Appellant made an objection to the prosecutor appealing to the sympathy of the jury, which was overruled. The only argument Appellant makes with respect to this point is that "the objection should have been granted." Because Appellant has not developed his argument, we will not consider it on appeal. *See Springs, supra.*

### VIII.   *Ark. Sup.Ct. R. 4–3(h)*

The record in this matter has been reviewed for other reversible error in accordance with Arkansas Supreme Court Rule 4–3(h), and none has been found.

Affirmed.