2011 Ark. 33

**Cleveland EVANS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 10–936.**

Supreme Court of Arkansas.

Feb. 3, 2011.

James Law Firm, by: Toney B. Brasuell, for appellant.

Dustin McDaniel, Att'y Gen., by: John T. Adams, Ass't Att'y Gen., for appellee.

PAUL E. DANIELSON, Justice.

Appellant Cleveland Evans appeals from his conviction for capital murder and his sentence to life imprisonment without parole. His sole point on appeal is that there was insufficient evidence to support his conviction. We affirm Evans's conviction and sentence.

On the evening of October 8, 2008, police responded to a call from a residence on Ward Street in Wrightsville, Arkansas, where they found Deshon Pride lying on the living-room floor dead from a gunshot wound. Evans was developed as a suspect in the shooting, and he turned himself in to the police the next morning. On July 31, 2009, an amended felony information was filed against Evans, alleging one count of premeditated and deliberated capital murder, one count of possession of a firearm by a certain person, two counts of intimidating a witness, a firearm enhancement, and that Evans was a habitual offender. A jury trial was held on June 15–16, 2010, and Evans was found guilty of capital murder and the firearm enhancement, but was

acquitted on both counts of intimidating a witness. While Evans was charged with the firearm enhancement and the jury found it applicable, the judgment and commitment order does not reflect that enhancement, nor does it reflect that Evans was a habitual offender. As already set forth, Evans was sentenced to life imprisonment without parole, and he now appeals.

For his sole point on appeal, Evans argues that there was insufficient evidence to support his conviction for capital murder. He contends that the evidence presented by the State failed to conclusively demonstrate that he was involved in the murder. He avers that there was no credible evidence that he was the one who killed Pride, and he urges that the jury used speculation and conjecture to reach its verdict. The State, however, counters that substantial evidence plainly supports Evans's conviction.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Johnson v. State,* 375 Ark. 462, 291 S.W.3d 581 (2009). We will affirm the circuit court's denial of a motion for directed verdict if there is substantial evidence, either direct or circumstantial, to support the jury's verdict. *See id.* This court has repeatedly defined substantial evidence as "evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture." *Id.* at 464, 291 S.W.3d at 583 (quoting *Hoyle v. State,* 371 Ark. 495, 501, 268 S.W.3d 313, 318 (2007)). Furthermore, this court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *See id.* In addition, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclu-

sion. *See Marcyniuk v. State,* 2010 Ark. 257, 373 S.W.3d 243. Whether the evidence excludes every other hypothesis is left to the jury to decide. *See id.*

Under Arkansas law, a person commits capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5–10–101(a)(4) (Supp.2007). Premeditated and deliberated murder occurs when it is the killer's conscious object to cause death, and he forms that intention before he acts and as a result of a weighing of the consequences of his course of conduct. *See Carmichael v. State,* 340 Ark. 598, 12 S.W.3d 225 (2000). Premeditation is not required to exist for a particular length of time. *See id.* It may be formed in an instant and is rarely capable of proof by direct evidence but must usually be inferred from the circumstances of the crime. *See id.* Similarly, premeditation and deliberation may be inferred from the type and character of the weapon, the manner in which the weapon was used, the nature, extent, and location of the wounds, and the accused's conduct. *See id.*

The record in the instant case reflects that there was substantial evidence to support Evans's conviction for premeditated and deliberated capital murder. Rodney Bostic, an officer with the Pulaski County Sheriff's Office, testified that, at around 6:15 p.m. on October 8, 2008, he received a call from Roderick Pride informing him that an individual named "Dank," who was driving a black Cadillac, was threatening to shoot Roderick's brother, Deshon Pride. He stated that he talked to Roderick and tried to locate the car, but was unable to do so; he then continued his patrol. Officer Bostic testified that at approximately 10:48 p.m., he received another call to the same neighborhood and that, upon arrival at the resi-

dence, he saw a black male, later identified as Deshon Pride, lying on the floor of the home. He stated that while he and other officers tried to find "the suspect" by going to his home, they did not locate him; they did, however, look for and locate a black Cadillac. Officer Bostic confirmed that he was referring to Evans as the suspect.

Sergeant Serena Snead, also of the Pulaski County Sheriff's Office, testified that, upon her arrival at the scene of the shooting, she saw Deshon Pride lying on his back on the living-room floor. She testified that, after calling together the investigation team, it was learned from the other investigators that the suspect in question was known as Dank. She stated that, with knowledge that Dank was Evans, they began to search for him. She too testified that a black Cadillac believed to be Evans's was found "in between where the homicide scene was and [Evans's] residence."

Lepolen Sanders, Jr., testified that Dank, whom Sanders identified in court as Evans, stopped his car in the street between Sanders's house and Pride's house during the daytime on the day that Pride was killed. He testified that Evans was driving a black Cadillac and inquired as to whether he had seen Pride.[1] Sanders stated that Evans had a rifle and that Evans blew his horn several times and drove off after no one came to the door. He then testified that he told Roderick Pride that Evans was looking for Roderick's brother with a gun.

Talisha Baker, who was Pride's girlfriend, testified that, on the day Pride was killed, Evans came by her aunt's house where she was and asked her if she had seen Pride. She testified that Evans asked her to put his telephone number into her phone and to call him when she next saw Pride, but she declined. She then testified that Evans told her that he was going to kill Pride "around 10:00, 10:15" and that she should not be around or go home.

Yolanda Cunningham, Pride's cousin, also testified. She testified that she lived next door to Levester Spring and Jolinda Kitchen and that, on the day Pride was killed, she saw Evans at their home with them in their front yard. She stated that she heard arguing and looked out her bedroom window, where she saw Evans holding a handgun in his hand, and she heard Evans state to Jolinda that he did not want "Vester," but "want[ed] Shon." She testified that Evans was driving a black Cadillac. She further testified that at about 10:15 that evening, she heard three or four gunshots, ran next door, and saw Pride lying in the doorway of Spring and Kitchen's home.

Jolinda Kitchen testified that on the day of Pride's shooting, Evans came to her house and told her to "get Shon Pride away from there because he didn't want to do nothing to him." She stated that she inquired of Evans whether their disagreement was over money and asked "if Pride paid" would it make things better. She testified that Evans said no, because Pride had shot at him. She further testified that that evening Benny Martin came over while Pride was at her home. She testified that Martin yelled to Pride that he needed to "pay this man" and that the man "is not playing with you," to which Pride responded by telling Martin to leave. She stated that she then got into the bathtub, when she heard about four gunshots, at which time she looked around the corner

---

1. Sergeant Snead testified that Pride lived next door to the house in which he was killed and that Mr. Sanders lived across the street.

Sanders also testified that Pride "stayed" in the house across from him.

and saw Pride lying on the floor. She testified that about a week later, while she was staying somewhere else, Evans drove by, stopped, and inquired as to what the police and others were saying "about the case," while he had a gun on his lap. She stated that Evans told her that when Martin was walking away from the steps of her home the night of the shooting, Evans told him "[s]ee no evil, hear no evil."

Levester Spring, Jr., Kitchen's husband and Pride's cousin and next-door neighbor, also testified. He testified that around 5:00 or 5:30 p.m. of the day on which Pride was shot, Evans drove up to his home, was upset, and was holding a pistol. He stated that Evans said Evans was upset because Pride "had took a shot at him," but that Evans left about five minutes later. Spring testified that later that evening, Pride was dropped off at his house and that Benny Martin came over.[2] He testified that Martin went outside, on Pride's prompting, and that about eight minutes later Pride "looked at the door and said, 'Hey, hey, Dank.' He stated that he then heard gunshots. Spring stated that he did not see Evans or the gun because Spring was lying on the couch behind the door.

Gerald "Benny" Martin testified that after leaving Deluxe Liquor in Wrightsville on the day of the murder, he saw Evans walking and gave him a ride. He testified that during the drive, Evans constantly asked him if he had seen Pride. He stated that Evans wanted him to turn toward Pride's house, but that he refused because Evans and Pride were "into it." He then testified that Evans told him to let Evans out of the car, which he did. He further testified that while Evans was in his car, he could tell that he had a handgun.

Martin testified that he then went to Spring's home, and later, while talking with Pride, Evans opened the door and began shooting Pride. He stated that when Evans opened the door, Pride said, "Dank, Dank, Dank." He further testified that after shooting Pride, Evans ran out the door. Martin stated that he then got into his truck and drove away. He said that while he was driving, a car flashed its lights at him, and he stopped. He testified that Evans pulled up beside him and said, "Benny man, you ain't seen nothing." He stated that he then drove home, but that ten or fifteen minutes later, his doorbell rang. He testified that it was Evans and that Evans told him that they needed to talk, to which Martin responded that there was no need. He stated that Evans told him, "We need to talk," and "Speak no evil, see no evil." Martin testified that he then closed and locked the door and called 911.

Eric Garman also testified that he, too, was briefly at the home of Kitchen and Spring the evening that Pride was shot. He testified that he was there until Martin arrived and that he then went back to his aunt's home, which was next door. He stated that while in his aunt's yard finishing a cigarette, he saw someone coming down the street. He stated that he knew it was Evans once he got closer, as Evans was walking into the yard of Kitchen and Spring. He then testified that when Evans reached the yard, he saw him pull a silver handgun from the back of his pants; Garman stated that he panicked and started beating on his aunt's door to let him in. He testified that he then heard five gunshots. Dr. Charles Kokes, the state's chief medical examiner, then testified that

2. He further testified that another neighbor, Eric Garman, also came over, but left after about twenty minutes.

Pride's proximate cause of death was gunshot wounds to the hip and leg.

In light of the foregoing evidence, we hold that substantial evidence existed to support Evans's conviction for premeditated and deliberated capital murder. While Evans argues that the State's witnesses were not credible and relies heavily on his defense witnesses who testified that he was at their home passed out on the evening of the murder, his arguments are of no moment. We have held time and time again that the credibility of witnesses is a matter for the jury's consideration. *See Clemons v. State,* 2010 Ark. 337, 369 S.W.3d 710; *Rounsaville v. State,* 2009 Ark. 479, 346 S.W.3d 289. Furthermore, the trier of fact is free to assess inconsistencies in witness testimony. *See Wyles v. State,* 368 Ark. 646, 249 S.W.3d 782 (2007). As such, we will not pass upon the credibility of a witness and have no right to disregard the testimony of any witness after the jury has given it full credence, unless the testimony is inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon. *See id.; Davenport v. State,* 373 Ark. 71, 281 S.W.3d 268 (2008). Despite Evans's claims to the contrary, the testimony in the instant case simply fails to meet that threshold. For these reasons, we affirm Evans's conviction and sentence.

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2010), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Evans, and no prejudicial error has been found.

Affirmed.