Roy Don TESTER *v.* STATE of Arkansas

CR 00-409                                      30 S.W.3d 99

Supreme Court of Arkansas
Opinion delivered November 9, 2000

*Henry & Cullen, L.L.P.*, by: *Mark Murphey Henry*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Roy Tester was charged with capital murder in connection with the deaths of his parents, Don and Dana Tester. Following a jury trial, he was convicted of first-degree murder for the death of his father, and capital murder for the death of his mother. He received a life sentence for each conviction. Tester now appeals, raising three points for reversal. We affirm.

The bodies of Don and Dana Tester were discovered in their home just outside of London in Pope County on the morning of Saturday, July 18, 1998. It was later determined that they had both been strangled; in addition, Dana Tester's throat had been cut. One of their cars, a purple Dodge Stratus, was missing from their home, as were two guns, some of Don Tester's rings and his watch, and Mr. Tester's guitar and guitar case.

The facts that developed at trial reveal the following. Roy Tester went to his parents' home on the morning of Friday, July 17, with Mary D'Angelo and Thomas Taylor. After visiting with Mrs. Tester for some time, the three left the house, but returned a few hours later. Tester was inside talking to his mother when his father came inside and asked why Tester had come back. Tester and his father began arguing, and according to D'Angelo, Tester told his father that "all I wanted to do was give you a hug." As Mr. Tester tried to push his son off of him, D'Angelo said, Tester started to choke his father. Mrs. Tester, who had recently had back surgery, was apparently unable to intervene. D'Angelo said that a few minutes later, the elder Tester was laying down on the ground; his face was a purplish-brown color, and he was not breathing.

At that point, D'Angelo and Taylor left the house, but not before they saw that Tester had gone to his mother and had a tight grip on her, holding her down tightly. Some few minutes later, Tester came out of the house with a black guitar case, and the three left the house; Tester drove the Dodge Stratus away, with Taylor and D'Angelo following in Tester's father's white pickup truck. Shortly thereafter, Taylor and D'Angelo parked the truck and got into the Stratus with Tester, and the three drove to Houston, Texas.

While in Houston, Tester confessed to D'Angelo and Taylor that he had killed his parents. According to D'Angelo, "it was really getting to him . . . 'cause he had killed his mom . . . , and he said he didn't mind killing his dad, but it really broke him down to kill his mom. It was getting to him that . . . he had sliced her throat."

■ For his first point on appeal, Tester argues that there was insufficient evidence to convict him of capital murder in the death of his mother.[1] He contends that the trial court should have granted his motion for directed verdict based on his affirmative defense that he was not guilty by reason of mental disease or defect. A motion for directed verdict is a challenge to the sufficiency of the evidence. *Terrell v. State*, 342 Ark. 208, 27 S.W.3d 423 (2000). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence that is of sufficient certainty and preci-

---

[1] Tester does not challenge his conviction for first-degree murder in the death of his father.

sion to compel a conclusion one way or another. *Id.* (citing *Byrd v. State*, 337 Ark. 413, 992 S.W.2d 759 (1999)). In a challenge to the sufficiency of the evidence, the appellate court reviews the evidence in the light most favorable to the State and sustains a judgment of conviction if there is substantial evidence to support it. *Id.* (citing *Abdullah v. State*, 301 Ark. 235, 783 S.W.2d 58 (1990)).

However, when a defendant challenges the sufficiency of the evidence, he must apprise the trial court of the specific basis on which the motion is made. *Brown v. State*, 316 Ark. 724, 875 S.W.2d 828 (1994) (citing *Middleton v. State*, 311 Ark. 307, 842 S.W.2d 434 (1992)). A directed verdict motion must be a specific motion to apprise the trial court of the particular point raised. *Id.* (citing *Patrick v. State*, 314 Ark. 285, 862 S.W.2d 239 (1993)). The reasoning underlying our holdings is that when specific grounds are stated and the absent proof is pinpointed, the trial court can either grant the motion, or, if justice requires, allow the State to reopen its case and supply the missing proof. *Id.* (citing *Standridge v. City of Hot Springs*, 271 Ark. 754, 610 S.W.2d 574 (1982)).

It is well-settled that parties cannot change the grounds for an objection on appeal, but are bound by the scope and nature of the objections and arguments presented at trial. *Pike v. State*, 323 Ark. 56, 912 S.W.2d 431 (1996) (citing *Stewart v. State*, 320 Ark. 75, 894 S.W.2d 930 (1995)). This is true even in cases where the sentence is life without parole, as our duty is only to examine the record for error on objections decided adversely to the appellant, not to address arguments that might have been made. *Id.* (citing *Childress v. State*, 322 Ark. 127, 907 S.W.2d 718 (1995)).

At the close of the State's case, counsel for Tester made the following statements:

> BY MR. DUNHAM: Judge, the Defendant moves for a directed verdict on counts one and count two of the Second Amended Information filed August 25, 1999.
>
> It's my understanding that is the last amended information that's been filed. Both counts allege that the Defendant caused the death of the named individual with the premeditated and deliberated purpose of causing the death.
>
> There is insufficient evidence from which a jury could find beyond a reasonable doubt that the Defendant engaged in premed-

itated and deliberated purpose of causing the death of either victim.

There's been no testimony whatsoever about the intention and according to the state's own witness, Ms. D'Angelo, who was an eye witness, it was unexpected and appeared to her to be a response to the conduct of Don Tester.

Under the circumstances there is simply insufficient evidence to convict for capital murder. That's my motion.

BY THE COURT: The Court will deny that. Are you ready to proceed, Mr. Dunham?

BY MR. DUNHAM: Yes, sir.

At the close of the defense's case, the following statements were made:

BY THE COURT: Mr. Dunham, you may proceed.

BY MR. DUNHAM: The Defendant renews his motions for directed verdict previously made on the same basis.

BY THE COURT: Okay. I'll deny those, Mr. Dunham, based on the same reasoning of the Court on your first motion.

■ Thus, Tester's motions for directed verdict were made on the basis that there had been insufficient evidence of premeditation and intent. More particularly, counsel argued at trial simply that the State's witness, Ms. D'Angelo, said Roy Tester's acts were unexpected. On appeal, however, he argues that the trial court erred in denying his motions for directed verdict "based on his affirmative defense that he was not guilty by reason of mental disease or defect." While he does continue to argue that there was insufficient evidence of premeditation and deliberation, he premises this contention solely on the fact that there was evidence presented that he suffered from a mental defect or deficiency. The trial court, however, was never apprised of this specific basis for the directed-verdict motion. Therefore, we cannot consider this point for reversal.

Tester's second point on appeal is that the trial court erred in refusing to suppress the in-court identification of Sam Platt, a Houston pawn-shop owner who identified Roy Tester in a photograph shown him by officers investigating the case. The trial court had held a hearing on Tester's motion to suppress the identification,

at which time the following facts were revealed. Pope County Sheriff Jay Winters discovered that the purple Dodge Stratus missing from the Testers' house had been located in a Houston, Texas, impound yard. Upon arriving in Houston, Sheriff Winters also found some of the Testers' property — the guitar, some rings, and a watch — at a pawn shop. The Sheriff spoke to Sam Platt, who remembered that two men brought the items in, but that only one of them actually pawned them. Platt remembered the second man, however, because he had played the guitar for seven or eight minutes, and he described the second man as a white male, 5'10" to six feet tall, with long black hair, facial hair, and a dark complexion. At the hearing on the motion to suppress, Platt identified the man he saw in the pawn shop as Tester.

Sergeant John Swaim, an investigator in the homicide division of the Houston Police Department, testified at the hearing that he interviewed Platt, who described the man who had visited the pawn shop as "a white male, about five foot eight inches tall, medium build, and dark hair. I believe he said he had a ponytail." It was not until after this encounter, where Platt described the man he had seen, that Sergeant Swaim showed him a photo of Tester; at that time, however, when Swaim asked if the man in the photograph was the man Platt had described, Platt responded that it was.

After considering this testimony, the court ruled that it would allow an in-court identification during the trial, but stated that it "had a problem" with the identification given to the officers when the photograph was presented. The judge ruled that Platt could give an in-court identification based on the seven-or-so minute time period that he saw him play the guitar, but that he could not reference the photograph the officers showed him on their subsequent visits. Platt offered testimony consistent with this ruling.

■ Even if prior identifications may have been improper or suggestive, an in-court identification will not be suppressed if indicia of reliability are found to independently exist. *Burnett v. State*, 302 Ark. 279, 790 S.W.2d 137 (1990). A court may consider a number of factors in determining whether such indicia of reliability exist, including the following: the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the

lineup, failure to identify the defendant on a prior occasion, the lapse of time between the alleged act and the lineup identification, and the degree of certainty that a witness professes to possess that the perpetrator and the defendant are the same individual. *Burnett*, 302 Ark. at 282 (citing *United States v. Wade*, 388 U.S. 218 (1967), and *Neil v. Biggers*, 409 U.S. 188 (1972)). The conclusion to be drawn from these factors is dependent on the totality of the circumstances. *Id*.

■ Even if the identification technique is impermissibly suggestive, it is for the trial court to determine if there are sufficient aspects of reliability surrounding the identification to permit its use as evidence, and then it is for the jury to decide the weight the identification testimony should be given. *Chenowith v. State*, 321 Ark. 522, 905 S.W.2d 838 (1995). We do not reverse a ruling on the admissibility of an identification unless it is clearly erroneous, and we will not inject ourselves into the process of determining reliability unless there is a very substantial likelihood of misidentification. *Id*.

■ Sam Platt, who had seen Tester in a brightly lit area for approximately fifteen minutes, gave an accurate description of Roy Tester to two different law enforcement officers before ever seeing a photograph of him. Platt never identified anyone else as the man he had seen in his pawn shop, and the first identification came only five-and-a-half weeks after seeing him for the first time. It cannot be said that there is a "very substantial likelihood of misidentification" in this instance, and the trial court's ruling was not clearly erroneous.

Tester's third argument is that the trial court erred in failing to suppress a statement from his sister, Donna Martin, that he had confessed the murders to her. Tester's trial was set for August 30, 1999. On August 25, 1999, the prosecution sent a letter to defense counsel, stating that "in addition to the statements by Roy Don Tester already provided to you, the State has discovered that Mr. Tester made a statement to his sister Donna Martin. Mr. Tester made the following statement: "I strangled dad. I strangled mom, but I couldn't have cut mom's throat."

Tester immediately filed a motion to suppress that statement, arguing that the late disclosure of the statement and the suspicious

circumstances of its disclosure by Donna Martin to the prosecutor rendered the statement completely unreliable. Further, he contended that the late disclosure, after the time in which he had been assured that all statements which would be used at trial had already been disclosed, violated Ark. R. Crim. P. 17.1.

The trial court held a hearing on the motion to suppress shortly before the trial started. The prosecution informed the court that Donna Martin had not come forward with her brother's statement until after a trial preparation meeting with the prosecutor during which she had heard the statement in Tester's psychiatric evaluation that Tester had no memory of strangling his mother. Upon hearing that part of the report, Martin related the statement above. The prosecutor told the court that as soon as he knew of the existence of this statement, he forwarded it to defense counsel. At that point, the judge offered Tester a continuance, suggesting that the real problem was not with the admissibility of the statement, but with whether or not it would prejudice Tester in the preparation of his trial. Tester, however, expressly rejected the continuance, stating that the situation would be the same in a week or a month. The court thereupon denied the motion to suppress.

On appeal, Tester argues that this amounted to a discovery violation, and that the State subjected the defense to an unfair surprise after discovery was closed. This court discussed the rules dealing with discovery and the prosecutor's obligation to disclose certain statements to defense counsel in *Rayford v. State*, 326 Ark. 656, 934 S.W.2d 496 (1996).

> Rule 17.1(a)(ii) of the Arkansas Rules of Criminal Procedure mandates that the prosecutor disclose, upon timely request, "any written or recorded statements and the substance of any oral statements made by the defendant." Rule 19.2 imposes a continuing duty on the prosecutor to disclose this information. In the event of noncompliance, Rule 19.7 allows the trial judge to order the undisclosed evidence excluded, grant a continuance, or enter such an order as he or she deems proper under the circumstances. The key in determining whether a reversible discovery violation exists is whether the appellant was prejudiced by the prosecutor's failure to disclose. *Bray v. State*, 322 Ark. 178, 908 S.W.2d 88 (1995).

*Rayford*, 326 Ark. at 658–59. It is within the trial court's discretion as to which sanction to employ. *Reed v. State*, 312 Ark.

82, 847 S.W.2d 34 (1993) (holding that any possible prejudice caused by the state's failure to comply with the pretrial discovery rule would have been cured by a continuance, and since the trial court offered appellant a continuance before any testimony was presented, which he declined, there was no error).

■ However, even if we were to find that the State had violated its discovery obligations,[2] the trial court offered to give Tester a continuance in order to figure out how to deal with the statement; Tester, however, refused this offer. No reason was given by Tester that the week or so the trial court offered him as a continuance would be insufficient to counter or to impeach Ms. Martin's testimony. Because he rejected the trial court's offer of a continuance, he cannot claim that the refusal to suppress the statement was reversible error.[3]

The record has been examined under Ark. Sup. Ct. R. 4-3(h) for reversible error, and none has been found.

For the foregoing reasons, Tester's convictions are affirmed.

---

[2] We do not concede that a discovery violation occurred in this case, as the prosecutor immediately forwarded Donna Martin's statement to defense counsel, thus fulfilling his obligations under Ark. R. Crim. P. 19.2.

[3] We also note that the State introduced, without objection, Mary D'Angelo's testimony that Tester confessed the murders to her, including her statement that he told her that he had cut his mother's throat.