2010 Ark. 257

**Zachariah Scott MARCYNIUK, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 09–634.**

Supreme Court of Arkansas.

May 27, 2010.

Rehearing Denied Aug. 6, 2010.

Janice W. Vaughn, Arkansas Public Defender Com'n, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Valerie Glover Fortner, Ass't Att'y Gen., and Kathryn Henry, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice.

⌊₁A Washington County jury convicted Appellant Zachariah Marcyniuk of capital murder and sentenced him to death by lethal injection.[1] On appeal, appellant claims that the circuit court erred in denying his motions for directed verdict, that the circuit court erred in allowing certain photographs into evidence and permitting

---

1. The jury also convicted appellant of residential burglary for which he was sentenced to 240 months' imprisonment, but he does not challenge that conviction on appeal.

the State to enlarge photographs of the victim on a projection screen, and that the circuit court erred in denying his motion to suppress statements appellant made during a traffic stop. Because this is a capital case involving a sentence of death, our jurisdiction is pursuant to Rule 1–2(a)(2) of the Rules of the Arkansas Supreme Court. We affirm on all points.

On March 9, 2008, at 7:21 a.m., a resident at the Colonial Arms Apartments in Fayetteville called 911 after being awakened by a woman screaming for help. One witness recalled the woman exclaimed "please don't kill me." When Fayetteville police officers arrived ten minutes later, they found a purse and woman's shoe in front of the door to apartment eleven. A chain-link fence surrounding the pool area was "bowed inward" toward the pool in front of the door to that same apartment. Using a cellular phone found in the purse, the officers called Sharon Wood, who was listed as "mom" in the contact directory. She explained the phone belonged to her daughter, Katie Wood, who lived in that apartment. She gave permission for the officers to break into it to investigate. Upon doing so, the officers discovered signs of a bloody struggle in the kitchen. Thereafter, they discovered Katie's deceased body in the locked bathroom where she had been placed in the empty bathtub fully clothed. Although not immediately apparent, it was discovered later that she had been stabbed six times and suffered a blunt-force trauma to the back of her head. Officers did notice an assortment of wounds to her arms, hands, and face. Officers discovered a partially open window in the bedroom of the apartment. In addition, they also found Katie's broken key ring and the front-door key bent nearly in half.

As the investigation progressed, appellant became the lead suspect. Notably, his mother and father contacted police because they were concerned for Katie after appellant showed up at his mother's home around 8:00 a.m. on the morning of the murder in a disheveled, frantic state asking her to take care of his dog and stating that he thought he had hurt Katie. A warrant for first-degree murder was issued, and that afternoon, appellant was pulled over by Lieutenant Donald Kerr of the Oklahoma Highway Patrol for speeding in an area approximately five hours from Fayetteville. The on-board camera system illustrated that Officer Kerr approached appellant's car and that appellant followed the officer back to his patrol car, where the following colloquy occurred while they were both seated in the front:

OFFICER: How's it going? You were going a little fast.

APPELLANT: Sorry about that.

OFFICER: Where you headed?

APPELLANT: Amarillo.

OFFICER: What the purpose of your trip there to Amarillo?

APPELLANT: I have a friend who lives down there. He's moving back to Arkansas.

OFFICER: Is the vehicle registered in your name?

APPELLANT: Well, my mom has the title. So I was going too fast?

OFFICER: What kind of work you do out there?

OFFICER: What happened to your face? It's scratched. How much do you weigh about?

APPELLANT: 160

OFFICER: I'll just write a warning on your speed, man, so make sure you watch it. We've got to wait and we'll make sure your license comes back good and we'll get you out of here in a minute, okay?

248

After dispatch alerted Officer Kerr that a warrant for first-degree murder had been issued against appellant, the officer exited the patrol car and arrested appellant. Officer Kerr immediately read appellant his *Miranda* rights, which appellant stated he understood. Thereafter, the following conversation occurred:

> OFFICER: You got any idea about a warrant for murder? Did you kill somebody? Huh?
>
> APPELLANT: No. Not that I know of.
>
> OFFICER: What do you mean not that you know of? Clearly something gave you a scratch you on your face? What's going on?
>
> . . .
>
> OFFICER: All right, man, you know your rights. What's going on?
>
> APPELLANT: I don't know what's going on.
>
> OFFICER: Well, you know you're under arrest for a warrant, it's First Degree Murder.
>
> OFFICER: So you were going to Amarillo?
>
> APPELLANT: Yeah, I was thinking about going even further, to see the ocean.
>
> Officer: It looks like somebody scratched your face, like a human scratch, it doesn't look like a dog scratch.
>
> . . .
>
> OFFICER: Okay. Where did this happen at? In Arkansas? You're not gonna say nothing?
>
> APPELLANT: I'm being honest with you when I say I really don't remember.

Officer Kerr testified that appellant appeared casual throughout the stop and did not seem nervous. Appellant was taken to a local detention center until Fayetteville Police picked him up the next morning.

At trial, the State presented evidence that appellant had been at work delivering pizzas until nearly 1 a.m., clocking out early in the early morning hours of March 9. Several of Katie's friends testified that she and appellant had dated for nearly a year and a half but that Katie had recently broken off the relationship. Those friends each told police about an incident that took place at a local bar where appellant and Katie had argued a few days before the incident because he wanted to get back together with her, but she was not interested. Katie had indicated that she believed he had stolen her cellular phone.

Appellant testified in his own defense and did not deny that he caused Katie's death. He explained that he was upset about the breakup and desperately wanted to get back together with her. He stated that he had been driving past Katie's apartment routinely in the weeks since the breakup. He testified that he had "kept after her to recommit" and "was obsessed with the idea of getting back with her." He admitted that he had approached Katie a few nights before the incident at a local bar and "made a pest of" himself. He claimed that he thought they had worked out their disagreements and might get back together. On the night before the incident, he stated that he left work early and probably went home before deciding to go to Katie's apartment to return her cellular phone that he had taken the last time he was in the apartment. He acknowledged he parked in a rear lot of the apartment complex where Katie would not have seen his car if she parked in the front. He admitted that he entered the apartment through an unlocked bedroom window. He stated that he used her computer to try to access her email in hopes of discovering if she was seeing someone else. He acknowledged that he did not have the cellular phone with him when he entered the apartment and claimed that he forgot

to bring it with him. He testified that he fell asleep in Katie's apartment at some point, and when he awoke, Katie was opening the front door and screaming. He admitted grabbing her and wrestling with her in the kitchen. He stated that he just wanted the screaming to stop. He said he remembered grabbing a knife, but he alleged that he could not remember specific details. He claimed that he put Katie in the bathtub to try to revive her. He said that he left the apartment through the bedroom window, taking the knife with him, and went back home. He packed a bag, picked up his dog, and drove to his mom's house. On the way, he drove by Katie's apartment, but he decided not to stop because he saw police cars. After dropping his dog off with his mother, he disposed of the knife somewhere along the road, and he headed west toward the ocean to commit suicide. He claimed that he never wanted to hurt Katie and did not remember what had happened during their altercation. Appellant admitted that he had pled guilty to aggravated assault a few years earlier after his former girlfriend, Sara Huffman, broke up with him. Sara got an order of protection against him after he broke into her apartment. Thereafter, he drove over seventy miles an hour down the interstate with her in the car while pointing a gun to his head, which resulted in the aggravated-assault charges.

During appellant's presentation of his defense, Dr. Brad Diner, who had been hired by appellant, testified to appellant's mental health. Dr. Diner stated that appellant suffered from recurrent major depression. Dr. Diner explained that appellant had suffered from severe depression since his early teens. Dr. Diner believed that appellant also suffered from dissociative amnesia, which would explain why appellant did not remember the exact events surrounding Katie's death. Dr. Diner also diagnosed appellant with borderline personality disorder with schizotypal traits. He explained that appellant was extremely bright, receiving high scores on standardized tests and able to keep a job and attend college. However, Dr. Diner noted that appellant's grasp on reality was tenuous. Dr. Diner concluded that appellant was competent to stand trial and assist in his defense, but that due to appellant's mental disorders, he was unable to conform his behavior to the law, he could not form the intent necessary to commit murder, and it was not his conscious object to cause Katie's death. On cross examination, the State asked Dr. Diner to review a letter appellant had written to Shannon Wilks, who had accused him of threatening her in her apartment. In the letter, appellant cursed Wilks, invited her to kill herself, and called her a "shallow piece of trash bitch," among other things. Dr. Diner stated that nothing appellant wrote in the letter changed his diagnosis and that appellant's repeated behavior of idolizing women then demonizing them after a break up was consistent with his personality disorder.

On rebuttal, the State presented the testimony of Dr. Michael Simon, who had been ordered by the court to evaluate appellant's mental health. He testified that he had diagnosed appellant with an adjustment disorder with mixed anxiety and depressed mood and borderline personality disorder. Dr. Simon stated that it was his opinion that appellant did not have a mental disease or defect under Arkansas law. Dr. Simon admitted that borderline personality would affect appellant's ability to control his actions and emotions in certain situations. However, Dr. Simon was convinced that appellant could appreciate the criminality of his conduct at the time of the murder and that his adjustment disorder and personality disorder did not meet the legal criteria for mental disease or defect.

Dr. Simon pointed to several facts that supported that appellant knew what he did was wrong, including fleeing the scene and discarding evidence. Dr. Simon concluded that people suffering from borderline personality had poor anger control but that appellant was responsible for his actions. He admitted that as a borderline, it was possible that appellant could have slipped into a dissociative state when placed under great stress. Dr. Simon also acknowledged that there was no indication that appellant was faking symptoms or malingering.

## I. *Sufficiency of the Evidence*

For his first point on appeal, appellant asserts that the circuit court erred in denying his motions for directed verdict on the grounds that the State failed to prove the elements of premeditation and deliberation to sustain a capital murder conviction and that appellant was [8unable to conform his conduct to the requirements of the law at the time of the murder due to mental disease or defect. The State responds and claims that appellant failed to preserve his argument with regard to the affirmative defense of mental disease or defect and that there was sufficient evidence of premeditation and deliberation to support the circuit court's ruling.

Our standard of review for a sufficiency challenge is well settled. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Navarro v. State*, 371 Ark. 179, 264 S.W.3d 530 (2007). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character

that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

Furthermore, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* The credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Although medical evidence and expert testimony can be highly persuasive, the jury is not bound to accept the opinion testimony of any witness as true or conclusive, including the opinion testimony of experts. *Id.*

[9Under Arkansas law a person commits capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5–10–101(a)(4) (Repl.2006). Premeditation and deliberation may be formed in an instant. *Winston v. State*, 372 Ark. 19, 269 S.W.3d 809 (2007). Intent can rarely be proven by direct evidence; however, a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *Robinson v. State*, 363 Ark. 432, 214 S.W.3d 840 (2005).

In evaluating whether sufficient evidence supports the jury's finding of premeditation and deliberation, we review only the evidence consistent with the jury's verdict. The State presented evidence that appellant was obsessed with Katie

following their breakup; that he had been following her consistently and pestering her; that he had stolen her cellular telephone in an effort to discover if she was dating someone else; that he broke into Katie's apartment in the early morning hours of March 9, staying for several hours until her return; and that he stabbed her as she unlocked the front door. Physical and forensic evidence supported a finding that appellant's attack on Katie was immediate and intense. There was a violent struggle in which she begged for her life. The jury could conclude that appellant attempted to cover up the crime by hiding her body in a locked bathroom and fleeing the scene through the bedroom window. From these facts, a jury could easily infer that appellant laid in wait for Katie and killed her when she arrived home. After the murder, appellant then $|_{10}$returned home to collect his belongings, dropped off his dog at his mother's home, disposed of the murder weapon, and fled out of the state. When he was stopped during a routine traffic stop, he calmly lied to the officer about his destination and how he received the scratch on his face. As a whole, the evidence presented was sufficient to sustain a conviction for capital murder.

▮▮▮ Appellant also argues that the trial court erred in denying his directed-verdict motion because appellant was unable to conform his conduct to the requirements of the law at the time of the murder due to mental disease or defect. Before considering the merits of appellant's claim, we must address the State's assertion that appellant failed to preserve this argument. Pursuant to Ark.Code Ann. § 5-2-312 (Repl.2006),

(a)(1) It is an affirmative defense to a prosecution that at the time the defendant engaged in the conduct charged he or she lacked capacity as a result of mental disease or defect to:

(A) Conform his or her conduct to the requirements of law; or

(B) Appreciate the criminality of his or her conduct.

A defendant bears the burden of proving the affirmative defense of mental disease or defect by a preponderance of the evidence. *Navarro, supra.* Furthermore, Ark.Code Ann. § 5-2-303 (Repl.2006) allows the admission of evidence that the defendant suffered from a mental disease or defect to prove whether the defendant had the requisite culpable mental state required for the commission of the offense.

We have repeatedly written that a challenge to the sufficiency of the evidence requires the moving party to apprise the trial court of the specific basis on which the motion is made. $|_{11}$*Brown v. State,* 316 Ark. 724, 875 S.W.2d 828 (1994). The reasoning underlying our holdings is that when specific grounds are stated and the absent proof is pinpointed, the trial court can either grant the motion, or, if justice requires, allow the State to reopen its case and supply the missing proof. *Id.* Furthermore, we have held that to preserve for appeal whether appellant is entitled to the insanity affirmative defense, appellant must specifically move for directed verdict on the basis of mental disease or defect. *See Tester v. State,* 342 Ark. 549, 30 S.W.3d 99 (2000); *Brown v. State,* 316 Ark. 724, 875 S.W.2d 828 (1994).

Here, prior to trial appellant informed the court that he intended to rely on the affirmative defense of mental disease or defect. At the close of the State's case, counsel for appellant made the following motion for directed verdict:

The Defendant moves for a directed verdict on the charge of capital murder. The Defendant contends that there has been no sufficient evidence presented

before this case to go to the jury on the charge of Capital Murder. There's no proof of premeditated and deliberated intent or purpose to cause Ms. Wood's death.

At the close of appellant's defense, counsel for appellant stated "[w]e renew our motion we made at the close of the State's case, Your Honor, renew all motions." Appellant's motions for directed verdict were made on the basis that there had been insufficient evidence of premeditation and intent. On appeal, however, he argues both that the State failed to prove premeditation and deliberation and that he should have been found not guilty by reason of mental disease or defect. Based on our decisions in *Tester* and *Brown*, because appellant failed to move for directed verdict at the close of his defense on the basis of the affirmative defense of mental disease or defect, that issue is not preserved for our review. Therefore, we decline |₁₂to consider it as a point for reversal.[2]

## II. *Evidentiary Ruling*

■ In his second point on appeal, appellant contends that the circuit court abused its discretion by allowing the State to enlarge and publish to the jury seventeen photographs of the victim's body taken at the crime scene and during the autopsy. Appellant claims these photographs are "gruesome" and "ghoulish." Appellant further asserts that one particular photograph, State's Exhibit 57, was inflammatory and overly prejudicial and should not have been admitted at all.[3]

■ In general, the decision of admitting photographs is left to the circuit court's sound discretion. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). We will not reverse the trial court's decision absent an abuse of that discretion. *Id.* Photographs are ordinarily admissible when they are helpful to explain testimony. *Id.* Standing alone, a photograph that is inflammatory or cumulative is not sufficient reason to exclude it. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). We have often held that a photograph is not inadmissible |₁₃merely because it is cumulative and that the defendant cannot admit the facts portrayed to prevent the state from putting on its proof. *Berry v. State*, 290 Ark. 223, 227, 718 S.W.2d 447, 450 (1986). Of course, if a photograph serves no valid purpose and can only result in inflaming the passions of the jury, it is inadmissible. *Gruzen v. State*, 267 Ark. 380, 591 S.W.2d 342 (1979). Even the most gruesome photographs have been held admissible to show the nature and location of wounds in order to rebut a defendant's claim of self-defense, *Perry v. State*, 255 Ark. 378, 500 S.W.2d 387 (1973), or to show premeditation and deliberation, *Robinson v. State*, 269 Ark. 90, 598 S.W.2d 421 (1980). Moreover, other acceptable purposes for admitting photographs include showing the condition of the victim's body, the probable type or location of the injuries, and the

---

**2.** In declining to address appellant's affirmative defense due to lack of preservation, we note that we are aware of our obligations under Rule 10 of the Arkansas Rules of Appellate Procedure—Criminal, which includes the exceptions summarized in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), to the requirement that a party object at trial. We are satisfied that appellant's failure to preserve his affirmative defense of insanity does not fall within the purview of Rule 10.

**3.** At oral argument, appellant's counsel indicated that State's Exhibit 56 was also irrelevant and overly prejudicial. Appellant failed to argue this point in his brief on appeal; however, pursuant to our Rule 10 obligation to review whether the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant, we include that additional photograph in our analysis.

position in which the body was discovered. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000).

In *Mitchell v. State*, 295 Ark. 341, 750 S.W.2d 936 (1988) (reversed on other grounds), we remarked that virtually all photographs are enlargements to some degree, and having examined the one enlargement complained of, we found it had not been demonstrated that it accentuated the injuries of the victim in any unfairly prejudicial way. We reaffirmed that holding in *Harris v. State*, 314 Ark. 379, 382, 862 S.W.2d 271, 273 (1993), where we stated that although the photographs were "gory, and some are similar to each other," all were offered with investigating officers' testimony to depict the crime scene and show the extent of the wounds. We held that the extent of the wounds was relevant to show the defendant killed purposefully. Furthermore, we held that the enlargement of the photographs was not [14]overly prejudicial. *Harris*, 314 Ark. at 382, 862 S.W.2d at 273.

Here, the circuit judge stated that he had "spent a considerable amount of time" reviewing each photograph the State offered for relevancy and balanced the probative value versus the prejudicial effect. The State offered thirty photographs into evidence, but the judge only allowed seventeen into evidence.[4] Taking each photograph in turn, the court explained his reasoning for allowing its admission. Thereafter, the crime-scene photographs were introduced during the crime-scene technician's testimony to illustrate how the body was found, a depiction of the injuries to the body, and what the scene looked like when police arrived. Autopsy photographs were introduced during the forensic examiner's testimony to explain the nature of the injuries and cause of death. State's Exhibit 57, in particular, although "gory," was the only photograph admitted that illustrated that the victim's intestines had come outside of her body via a stab wound.[5]

We are convinced that the circuit judge did not abuse his discretion on this point. The trial court carefully examined each photograph offered for admission and weighed the appropriate balancing test. It exercised considerable discretion and restraint in deciding what [15]photographs to admit into evidence. Further, the court individually pointed out its basis for allowing in each photograph, whether because it accurately depicted the crime scene, the extent of Katie's injuries, the condition of Katie's body following the attack, or was essential for a full understanding of the State's forensic and investigatory witnesses. Finally, the enlargement of the photographs alone is not prejudicial under our holdings in *Mitchell* and *Harris*.[6] The

---

4. Of those seventeen, the State only used thirteen photographs during its case-in-chief.

5. There was some discussion as to whether this was an accurate depiction of her wounds or whether the crime-scene technician's removal of the body from the bathtub caused this injury. When the officers found the body, it was fully clothed and her injuries were not readily apparent. The crime-scene technician testified that he and several officers carefully removed the body from the bathtub and placed it a few feet away on the living room floor. It was upon lifting her coat that the full extent of her injuries were discovered.

The jury was informed of this information and could decide if it believed the injury was caused from the movement of the body or during the attack.

6. We note that our holding on this issue is consistent with other states, which have held that images properly admissible as photographs may be enlarged or projected onto a screen to illustrate or facilitate a witness's testimony. *See, e.g., People v. Harris*, 633 P.2d 1095 (Colo.Ct.App.1981); *Keperling v. State*, 699 A.2d 317 (Del.1997); *Ottis v. State*, 269 Ga. 151, 496 S.E.2d 264 (1998); *State v. Masden*, 990 S.W.2d 190 (Mo.Ct.App.1999);

projection of the photographs on a screen in the courtroom did not misrepresent the wounds in any way or accentuate them prejudicially. Therefore, we affirm on this point on appeal.

## III. *Suppression*

As his final point on appeal, appellant asserts that statements he made to Officer Kerr while seated inside the patrol car should have been suppressed because they were a result of custodial interrogation without the procedural safeguards dictated by *Miranda.*

As a preliminary matter, appellant argues in his brief that all statements he made to Lieutenant Kerr should have been suppressed, without regard to whether they were statements made prior to his arrest or after.[7] At the pretrial suppression hearing, appellant |₁₆clearly argued that the pre-arrest statements he made should have been suppressed because he had not been Mirandized and questioning in the officer's patrol car was a form of custodial interrogation—the same argument appellant makes on appeal. However, appellant's only argument at the pretrial suppression hearing with regard to post-arrest statements was that the audio quality of the recording made it difficult to hear whether appellant waived his *Mi-*

*randa* rights. It appears appellant has abandoned that argument on appeal.

When this court reviews a trial court's ruling on a motion to suppress, we make an independent determination based upon the totality of the circumstances. *Gilbert v. State,* 341 Ark. 601, 19 S.W.3d 595 (2000). We will reverse a trial court's ruling on a motion to suppress only if the ruling was clearly erroneous or clearly against the preponderance of the evidence. *Id.* Because the determination of a preponderance of the evidence turns on questions of credibility and the weight to be given testimony, we defer to the trial judge's superior position in this regard. *Lemons v. State,* 310 Ark. 381, 836 S.W.2d 861 (1992).

The police have a right to investigate and to ask investigatory questions; warnings are |₁₇not required if the questioning by police is simply investigatory. *Parker v. State,* 258 Ark. 880, 529 S.W.2d 860 (1975). Police inquiry is purely investigatory and proper until the suspect is restrained in some significant way. *Id.; see also Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Additionally, the Supreme Court has held that an officer's subjective and undisclosed view concerning whether a person being

---

Doyle v. State, 116 Nev. 148, 161, 995 P.2d 465, 473 (2000); State v. Snider, 168 N.C.App. 701, 609 S.E.2d 231 (2005).

7. In fact, appellant's third argument on appeal concerns this court because, in her brief, appellant's counsel misrepresents to this court what occurred in the patrol car. Counsel for appellant quotes to "pertinent portions" of the transcript of the videotaped conversation between Lieutenant Kerr and appellant as if the officer never realized midway through the traffic stop that appellant was warranted for murder, placed him under arrest, and Mirandized him. It is obvious from the record that the preliminary questions Lieutenant Kerr asked were related to

the routine traffic stop and that once the officer was apprised of the warrant, he placed appellant under arrest and read him his *Miranda* rights. Counsel for appellant "quotes" from the transcript as if *Miranda* was never given and the questioning just continued from a routine traffic investigatory nature into questioning about the murder. Furthermore, counsel for appellant asserts in her brief that appellant "was never even given a *Miranda* warning before being questioned." Her argument on the third point makes no mention of pre-*Miranda* statements and post-*Miranda* statements. Therefore, we refer this matter to the Professional Conduct Committee to take action, if warranted.

interrogated is a suspect is irrelevant to an assessment of whether the person is in custody for *Miranda* purposes. *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). We have recognized that interrogation in a police car is considered a significant factor in finding an individual under custodial interrogation. *Shelton v. State*, 287 Ark. 322, 699 S.W.2d 728 (1985). Furthermore, we discussed the applicability of *Miranda* to traffic stops in *Manatt v. State*, 311 Ark. 17, 29, 842 S.W.2d 845, 852 (1992), stating:

> In *Berkemer v. McCarthy* [*McCarty*], 468 U.S. 420 [104 S.Ct. 3138, 82 L.Ed.2d 317] (1984), the United States Supreme Court held that persons temporarily detained pursuant to a routine traffic stop are not "in custody" for purposes of *Miranda.* The Court reasoned that *Miranda* warnings were not required in such cases because the stop was temporary, it was public, and the atmosphere on a public street is not comparable to the "police dominated" custodial interrogation. The Court held that a motorist who is detained pursuant to a traffic stop is entitled to recitation of his rights only when the stop becomes such that he is "subjected to treatment that renders him 'in custody' for practical purposes."

The question before us is whether being questioned inside an officer's patrol car during a routine traffic stop rises to the level of custodial interrogation to require *Miranda.* In holding that it does not, we are particularly influenced by the Supreme Court's ruling in *Berkemer.* Here, appellant was not restrained in any way while sitting in the officer's car, and Lieutenant Kerr's actions and questioning up until he Mirandized appellant did not rise to those of a formal arrest. Furthermore, our holding in *Shelton* is easily distinguishable from the present case. *Shelton* did not involve a routine traffic

stop. Rather, the defendant was underage, and he was questioned inside the police car because he was a suspect in a murder. In the present case, appellant was twenty-nine years old and was inside the patrol car after he was pulled over for speeding. The inquiry was not focused on a particular crime. In fact, Lieutenant Kerr was simply preparing a warning citation. As the officer prepared the citation, he engaged in a conversation with appellant and asked him very routine questions. The facts do not suggest that appellant was a suspect in a particular crime or subject to the sort of police "dominance" that would indicate a custodial interrogation. Therefore, based upon the totality of the circumstances, the trial judge's denial of appellant's motion to suppress the statements made while Lieutenant Kerr prepared a warning citation was not clearly against the preponderance of the evidence.

### IV. *Compliance with Rule 4–3(i), Rule 10, and Ark.Code Ann. § 16–91–113(a)*

In his reply brief, appellant argues for the first time that the circuit court erred in submitting two aggravating circumstances to the jury—that Katie's murder was committed in an especially cruel or depraved manner and that appellant had committed a previous violent felony. Appellant correctly notes that his trial counsel objected to the aggravating factor involving cruelty and depravity and that his trial counsel failed to object to the prior felony aggravating factor. Under our Rule 10 analysis, even if not objected to, we are required to determine if evidence supports the jury's findings of these aggravating factors. We are satisfied that the evidence supports the jury's finding of those factors. There was no dispute that appellant had committed a prior felony for aggravated assault, and appellant's argument on appeal is that the

facts of that prior case did not support aggravated assault. In addition, the evidence that appellant broke into Katie's apartment, waited hours for her to return, and then viciously attacked her as she walked in the door, stabbing her several times, was sufficient to prove the murder was especially cruel or depraved.

■ Although not clearly articulated as an independent point on appeal, appellant argues that the death sentence cannot stand because the jury arbitrarily refused to consider appellant's mental disease or defect as a mitigating factor in the sentencing phase. This argument is not preserved for our review because appellant did not object on this basis at any point during sentencing or after. *See Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995).

We are conscious, however, of our obligation in death-penalty cases under Rule 10 of the Arkansas Rules of Appellate Procedure—Criminal to review whether the trial court failed in its obligation to bring to the jury's attention a matter essential to its consideration of the death penalty. Here, it is apparent that the jury considered appellant's mental issues as mitigating factors in determining the appropriate sentence. The jury acknowledged that appellant suffered from borderline-personality disorder and generalized anxiety disorder; however, it found that those disorders did not prevent appellant from being able to conform his behavior to the law and that he was not under extreme mental or emotional disturbance at the time of the murder. Therefore, this court is satisfied that the trial court did not fail in its obligation to bring matters essential to the jury's consideration of the death penalty—here, mitigating factors regarding mental disease or defect—before the jury.

We have further reviewed the entire record in this case pursuant to Rule 4–3(i)

of the Rules of the Arkansas Supreme Court, Ark.Code Ann. § 16–91–113(a), and Rule 10 of the Rules of Appellate Procedure—Criminal as required by law, and find no reversible error.

Affirmed.