2015 Ark. 316

**Fred L. WILLIAMS, Appellant**

v.

**STATE of Arkansas, Appellee**

**No. CR–14–1088**

Supreme Court of Arkansas.

Opinion Delivered September 17, 2015

Potts Law Office, Monticello, by: Gary W. Potts, for appellant.

Leslie Rutledge, Att'y Gen., by: Kent G. Holt, Ass't Att'y Gen., for appellee.

PAUL E. DANIELSON, Associate Justice

Appellant Fred L. Williams appeals from the sentencing order of the Drew County Circuit Court reflecting his convictions for murder in the first degree and abuse of a corpse and his total sentence of life imprisonment. His sole point on appeal is that the circuit court erred in denying his motions for directed verdict. We affirm Williams's convictions and sentence.

The facts, as taken from the record, are these. On the morning of April 5, 2013, Tangela Walton accompanied her daughter on a Southeast Arkansas Transportation bus from their home in Warren to her school in Monticello. After signing her daughter into school, Walton returned to the bus for transportation back to her home in Warren. During the trip, the bus driver observed Walton in what appeared to be an argument with someone on her cell phone. Between approximately 8:15 a.m. and 8:20 a.m., the bus dropped Walton off at her home; however, she failed to make arrangements for the return trip to pick up her daughter as she had in the past.

That afternoon, Walton was not at home when her two other children were dropped off after school, and she was unreachable on her cell phone. Upon her being reported to the police as missing, Williams, Walton's on-again, off-again boyfriend, was interviewed by Criminal Investigator Don Hollingsworth of the Warren Police Department. During the interview, Williams admitted speaking with Walton the morning of April 5, but denied knowing where she might be. In addition, Williams's home was searched, but neither Walton, nor her cell phone, was located at that time.

After obtaining Walton's phone records, Hollingsworth again interviewed Williams on April 10. At that time, Williams again admitted talking to Walton on the morning of April 5. Williams further conceded that he "might have texted" Walton later that day to ask what she was doing, but he denied having any arguments with her that day.

On April 14, Hollingsworth received notice that Williams and his attorney were at the Monticello Police Department for Williams to make another statement. When Hollingsworth arrived, Williams was on the floor, and Hollingsworth was told that Williams had had a seizure; he was taken to the hospital. While in the emergency room, Williams told Investigator Hollingsworth where Walton's body was located.

The next day, Williams was interviewed once more. At that time, Williams stated that Walton had called him on the morning of April 5 and asked him if he "want[ed] to get together and have sex." Williams said that he texted her "okay" and that he then went to Warren, picked her up, and they returned to his house in Monticello.

Williams said that they engaged in "kinky" sex, explaining that Walton wanted to be tied up and "try oxygen deprivation treatment where you put a bag over her head and have sex" in an effort to increase orgasm.

Williams told police that they had sex once already, but that Walton wanted to have sex again. He stated that after they had begun, he went into a seizure and "fell out on her." Williams said that when he awakened, Walton was smothered, and he panicked. He said that he stayed with her for a couple of hours, crying and trying to revive her, but at some point he carried her outside of his house and buried her. He further stated that he had thrown out the necktie used to bind her hands and the bag they had used during sex, and he denied having argued with Walton that day.

A bench warrant was subsequently issued for Williams's arrest, and he was charged with first-degree murder and abuse of a corpse. Following a jury trial, at which it was established that Walton died of asphyxia by undetermined means, Williams was convicted on both counts. He was sentenced as a habitual offender to life imprisonment on the charge of first-degree murder and twenty years' imprisonment on the abuse-of-a-corpse charge, to be served concurrently. He now brings the instant appeal.

As his only point on appeal, Williams argues that the circuit court erred in denying his motions for directed verdict. He contends that while the evidence shows that Walton died in his home, the evidence was insufficient to prove that he purposely caused Walton's death. Williams further asserts that the State's proof consisted solely of circumstantial evidence and that the jury was forced to resort to speculation when it found the requisite intent to convict him of murder in the first degree.

Thus, he urges, the circuit court erred in denying his directed-verdict motion on the charge of first-degree murder. In addition, Williams avers that, while he buried Walton's body after her death, he committed no act falling within the offense of abuse of a corpse. Specifically, he maintains that he buried Walton clothed, and that he neither mutilated her nor mistreated her body in an offensive manner; therefore, he contends, his motion for directed verdict on the count of abuse of a corpse should also have been granted.

The State responds that substantial evidence was presented to support both of Williams's convictions. With respect to his conviction for first-degree murder, the State asserts that the jury was free to accept Williams's admission to putting Walton in a situation in which she was intentionally deprived of oxygen, but it was also free to reject his assertion that her death was accidental asphyxiation due to his weight. It maintains that the jury was within its province to reject Williams's hypothesis of innocence, in light of his continued denials to police, his burying of her body, his disposal of the necktie and bag, his construction of an alibi through texts to Walton's phone, and the physical injuries to Walton's body. The State further argues that there was sufficient evidence to sustain Williams's conviction for abuse of a corpse, when the jury was the bellwether of what was reasonable and could have concluded that Williams's conduct in burying Walton's body in a shallow grave was offensive to a person of reasonable sensibilities.

Our standard of review for a sufficiency challenge is well settled. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *See Gilliland v. State*, 2010 Ark.

135, 361 S.W.3d 279. We affirm a conviction if substantial evidence exists to support it. *See id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *See id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *See Marcyniuk v. State,* 2010 Ark. 257, 373 S.W.3d 243. In other words, if there are two equally reasonable conclusions as to what occurred, this merely gives rise to a suspicion of guilt, which is not enough to support a conviction. *See Boldin v. State,* 373 Ark. 295, 283 S.W.3d 565 (2008).

### First–Degree Murder

Arkansas law provides that a person commits murder in the first degree if "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark. Code Ann. § 5–10–102(a)(2) (Repl. 2013). Further, "[a] person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5–2–202(1) (Repl. 2013). This court has observed that a criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *See Edmond v. State,* 351 Ark. 495, 95 S.W.3d 789 (2003). Therefore, we have recognized that the intent necessary to sustain a conviction for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *See id.* This court has further held that guilt can be established without eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *See id.*

The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *See Norris v. State,* 2010 Ark. 174, 368 S.W.3d 52. The question whether the circumstantial evidence excludes every other reasonable hypothesis consistent with innocence is one for the jury to decide. *See id.* On review, this court's role is to determine whether the jury resorted to speculation and conjecture in reaching its verdict. *See id.*

At trial, the State presented testimony that, on her return trip home, Walton appeared to be arguing with someone on her cell phone. It further presented the three statements that Williams gave to police on April 8, April 10, and April 15. In his initial statement, Williams stated that he had talked to Walton at around 8:00 a.m. on April 5 and that she had asked him to help her find a car. He said that he later texted her, agreeing to her request, but had not heard from her again. When questioned further about his conversation with Walton, Williams stated that she had told him that she was trying to get some people out of her house who had taken her keys. He also told police that he had spoken with Walton's sister, Angela, at around 4:00 p.m. that same day, who was looking for Walton (asking if Walton was with him). Williams explained that at first he thought Walton may have been at the casinos, but after hearing that Walton had not picked up her daughter from school, he began to think that maybe she was with "one of her friend guys." However, when questioned further, he stated that he did not think she would miss picking up her daughter for that reason. As for his whereabouts on April 5, Williams

told police that he had been in Monticello, had gone to the Piggly Wiggly that afternoon, and had gone to the casinos that evening with his soon-to-be new girlfriend, Donna Robinson. Williams encouraged the police to speak with Walton's sister and her mother to find out more about Walton's "sugar daddies" and opined that Walton's disappearance "smell[ed] like foul play" because she had been gone for three days.

While Williams told police of only one phone call with Walton the day she disappeared, the State presented testimony from Hollingsworth that Walton's phone records showed that Williams attempted to call, but did not reach, Walton's phone four different times between 8:09 a.m. and 8:14 a.m. He testified that Walton called Williams at 8:15 a.m., that the call lasted eighteen minutes and fifty-two seconds, and that it originated in Monticello and terminated in Warren. In addition, Walton made two more calls to Williams, one at 8:43 a.m., lasting twenty-three seconds, and another at 9:14 a.m., lasting thirty-three seconds.

Hollingsworth testified that the phone records further showed that Walton traveled back to Monticello from Warren because at 9:30 a.m. Walton received a call from someone that "hit off" the Wilmar cell tower, and at 10:28 a.m. she received another call that "hit off" the Monticello cell tower. Hollingsworth testified that the records showed that Walton never left Monticello after that because all remaining calls to her phone, the last being at 3:43 p.m., "hit off" the Monticello tower.

In addition, Hollingsworth provided testimony regarding several text messages sent by Williams to Walton that he did not reference in his initial statement to police. Specifically, at 12:26 p.m., the phone records presented by the State showed that Williams texted Walton, "Wht u doing u up

r sleep over ther." At 12:50 p.m., he texted, "Hey why u not answ my tex hope t see at club d weekend." And, at 2:47 p.m., Williams texted, "Hey call me whn u on d bus ok." Hollingsworth testified that these texts were important to his investigation because they were used by Williams in an attempt to establish an alibi.

In his second statement to police on April 10, Williams reaffirmed that he had spoken with Walton the morning of April 5 and then spent the day in Monticello and the night at the casinos. He admitted that after he talked with Walton he may have texted her to ask what she was doing. He then asked for Hollingsworth's card, said that he would meet with police again, and told them that he would call them as soon as he knew anything.

Hollingsworth testified that on April 14 he received word that Williams was with his attorney at the Monticello Police Department ready to give a statement. However, upon arriving, Hollingsworth found Williams on the floor with people standing over him after having had a seizure. After Williams was transported to the local hospital, Hollingsworth saw Williams at the emergency room, where he told Hollingsworth the location of Walton's body. The next day, Williams, with his attorney present, gave his final statement to police.

In that statement, Williams told police that around 8:00 a.m. or 9:00 a.m. on April 5, Walton called him and asked him if he wanted to get together to have sex. He said that he texted her his agreement and then went to Warren and picked up Walton. He stated that they returned to his home in Monticello, where they had "kinky" sex. Williams explained that Walton wanted to be tied up and "wanted to try oxygen deprivation treatment where you put a bag over her head and have sex, [which] increases the orgasm." He said that when they started to have sex for the

second time, he had a seizure and "fell out on her." Williams stated that when he woke up, Walton "was smothered." He contended that he did not know what to do and subsequently stayed in his house with her for two or three hours, crying, trying to revive her, and panicking. At some point, during daylight hours, Williams said, he carried her outside and buried her clothed body. He further explained that he did not know where Walton's cell phone was and that he had put the bag and necktie they had used in the kitchen trash. He then told police, "I'm very sorry. I love her. It's hard to believe I love her.... I didn't intend to kill her. I didn't plan to kill her. I didn't even plan to get (Inaudible) that day. It just started off by her phone call."

The State further presented testimony from Benjamin F. Wright, who was living with Walton's mother and saw Williams at the casino on the evening of April 5. Wright testified that when he asked Williams if Walton had reappeared, Williams told him that he had not seen her. Finally, the State presented the testimony of Dr. Adam Frederick Craig, who performed Walton's autopsy. Dr. Craig testified that Walton had seven recent bruises, including on her throat and the inner side of her upper arm, but no evidence that would indicate her having been bound or tied up. He further determined that Walton had died of asphyxia by undetermined means and that the manner of her death was homicide. When asked how he arrived at that determination, Dr. Craig stated that the fact that Walton's body had seven different areas of fresh injury was important. He explained that taking those multiple injuries into account, coupled with the fact that there was a death, "means that some kind of probably physical altercation occurred at the time, at or around the time of death."

Williams avers that the State's evidence does not show that he had a purposeful intent to kill Walton and that the jury was forced to rely on speculation and conjecture in reaching its verdict. Yet, Williams, while claiming to have done so for purposes of sexual exploration, candidly confessed to placing a bag over Walton's head to deprive her of oxygen. This court has held that a person is presumed to intend the natural and probable consequences of his actions. *See Wyles v. State,* 368 Ark. 646, 249 S.W.3d 782 (2007). The jury heard Williams's explanation of the circumstances surrounding Walton's death, and it was entitled to believe the State's account of the facts over his. *See id.* As we have repeatedly held, it is for the jury, not this court, to determine credibility and to resolve inconsistent evidence. *See, e.g., Ross v. State,* 346 Ark. 225, 57 S.W.3d 152 (2001).

This court has further recognized that efforts to conceal a crime, as well as lying to friends and police about one's involvement in a killing, can be considered evidence of consciousness of guilt. *See Coggin v. State,* 356 Ark. 424, 156 S.W.3d 712 (2004). Here, not only did Williams initially lie to police and others that he had not seen Walton, but he also buried her body and disposed of the necktie and bag he claims that they used. In addition, phone records reveal that he sent text messages to her phone, purporting to show that he was not with her, at times that he later admitted they were together.

For the foregoing reasons, the jury could have reasonably concluded that Williams placed the bag over Walton's head with the purpose to cause her death. Accordingly, we hold that the circuit court did not err in denying Williams's motion for directed verdict on first-degree murder.

*Abuse of a Corpse*

Williams further asserts that, although he buried Walton's body, he committed no act falling within the offense of abuse of a corpse, codified at Arkansas Code Annotated § 5–60–101 (Supp. 2013), which provides:

(a) A person commits abuse of a corpse if, except as authorized by law, he or she knowingly:

(1) Disinters, removes, dissects, or mutilates a corpse; or

(2)(A) Physically mistreats or conceals a corpse in a manner offensive to a person of reasonable sensibilities.

(B) A person who conceals a corpse in a manner offensive to a person of reasonable sensibilities that results in the corpse remaining concealed is continuing in a course of conduct under § 5–1–109(e)(1)(B).

(C)(i) As used in this section, "in a manner offensive to a person of reasonable sensibilities" means in a manner that is outside the normal practices of handling or disposing of a corpse.

(ii) "In a manner offensive to a person of reasonable sensibilities" includes without limitation the dismembering, submerging, or burning of a corpse.

(b) Abuse of a corpse is a Class C felony.

The State counters, however, that the jury could have easily concluded that Williams's conduct in burying Walton's body fell within the statute. We agree.

In 2011, section 5–60–101 was amended to define "in a manner offensive to a person of reasonable sensibilities" as "a manner that is outside the normal practices of handling or disposing of a corpse." Act of Apr. 1, 2011, No. 1003, 2011 Ark. Acts 4231. Here, Williams dug a grave near his home and buried Walton's body, thereby concealing her body, and, by finding him guilty of violating the statute, the jury concluded that he did so outside the normal practices of handling or disposing of a corpse. It was certainly within the jury's province to determine what would be considered the "normal practice" of disposing of a corpse. As we have held, a jury is entitled to draw upon common sense and experience in reaching its verdict. *See, e.g., Watson v. State,* 358 Ark. 212, 188 S.W.3d 921 (2004). Therefore, we hold that there was sufficient proof from which the jury could have concluded that Williams's actions constituted abuse of a corpse, and the circuit court's denial of Williams's directed-verdict motion on abuse of a corpse is affirmed.

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2014), the record has been reviewed for all objections, motions, and requests that were decided adversely to Williams, and no prejudicial error has been found.

Affirmed.